Stephen M. Doniger, Esq. (SBN 179314)
stephen@donigerlawfirm.com
**DONIGER / BURROUGHS, PC**
603 Rose Avenue
Venice California 90291
Telephone: (310) 590-1820

Thomas Maddrey, General Counsel
**AMERICAN SOCIETY OF**
**MEDIA PHOTOGRAPHERS, INC.**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
maddrey@asmp.org

*Attorneys for Amici Curiae*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE DMCA SEC. 512(H) SUBPOENA TO TWITTER, INC. | Case No.: 20-mc-80214 VC<br>_Hon.  Vince Chhabria Presiding_<br><br>**AMICI CURIE BRIEF OF AMERICAN PHOTOGRAPHIC ARTISTS, AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC. AND THREE OTHER CREATOR RIGHTS ORANIZATIONS** |

## **TABLE OF CONTENTS**

I.     INTEREST OF AMICI CURIE.........................................................................1

II.    INTRODUCTION………………………………………………………...3

III.   ARGUMENT……………………………………...………………..4

      A. Upholding Bayside's rights and protections as a copyright holder is critical………………………...……………………………4

      B. Copyright holders like Bayside have a statutory right to obtain the "identification of an alleged infringer" from a service provider……………………………………………………...………..6

      C. Twitter may not invoke fair use to thwart a Section 512(h) Subpoena……………………………………………………...7

             a. No authority permits it to invoke fair use……...……....8

             b. Service providers like Twitter must comply With Section 512(h) in order to secure DMCA protection………………………………………………10

             c. Service providers are poorly positioned to advocate fair use..……………………………………...12

IV.   CONCLUSION………………………………………...……………..14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Campbell v. Acuff-Rose Music*,
  510 U.S., 114 S.Ct. 1164 (1994) ................................................................. 13, 14

*Dr. Seuss Ent. L.P. v. ComicMix LLC*,
  983 F.3d 443, 453 (9th Cir. 2020) .............................................................. 12, 13

*Duncan v. Walker*,
  533 U.S. 167, 121 S. Ct. 2120 (2001) ............................................................... 9

*Fox TV Stations, Inc. v. Aereokiller, LLC*,
  851 F.3d 1002 (9th Cir. 2017) ........................................................................... 9

*Lenz v. Universal Music Corp.*,
  815 F.3d 1145 (9th Cir. 2016) ......................................................................... 11

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ......................................................................... 13

*The Andy Warhol Foundation for The Visual Arts, Inc. v. Lynn Goldsmith*,
  11 F.4th 26 (2nd Cir. 2021) ............................................................................... 8

Statutes

17 U.S.C. § 107 ................................................................................................. 11
17 U.S.C. § 107(1) ............................................................................................ 13
17 U.S.C. § 107(3) ............................................................................................ 13
17 U.S.C. § 107(4) ............................................................................................ 13
17 USC § 512(h) ......................................................................................... Passim
17 USC § 512(h)(1)-(4) ...................................................................................... 6

17 USC § 512(h)(5) ............................................................................. 6, 8

17 U.S.C. § 512(f) ................................................................................. 11

17 U.S.C. § 512(c) ......................................................................... 10, 11

U.S. Const. Art. I, § 8, Cl. 8 .............................................................. 3


Rules


Fed. R. Civ. P. 45 ............................................................................... 8, 9

Fed. R. Civ. P. 45(d)(3) ....................................................................... 8

Fed. R. Civ. P. 45(d)(3)(A)(i)-(iv) ...................................................... 9


Other Authorities


H.R. Rep. No. 2222,

  60th Cong., 2nd Sess., p. 7 (1909).................................................... 5

Toward a Fair Use Standard,

  103 Harv. L. Rev. 1105 (1990)........................................................ 13

## I.   INTEREST OF AMICI CURIE

**AMERICAN PHOTOGRAPHIC ARTISTS ("APA")** is a leading nonprofit organization run by, and for, professional photographers since 1981. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide.[1]

**AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC. ("ASMP")** is a 501(c)(6) non-profit trade association representing thousands of creator-members who produce and own substantial numbers of copyrighted works. These members all envision, design, produce, and sell their creative images in the commercial market to entities as large as multinational corporations, and as small as local mom and pop stores. In its seventy-six-year history, ASMP has been committed to protecting the rights of copyright holders, creators, and photographers while steadfastly promoting the craft of photography.

**GRAPHIC ARTISTS GUILD, INC. ("GAG")** has advocated on behalf of illustrators, graphic designers, and other graphic artists for fifty years. The Guild educates graphic artists on best practices through webinars, Guild e-news, resource articles, and meetups. The Graphic Artists Guild Handbook: Pricing & Ethical Guidelines raises industry standards and provides graphic artists and their clients guidance on best practices and pricing standards.

**NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION ("NPPA")** is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing, and distribution. NPPA's members include video and still photographers, editors, students, and representatives of businesses that serve the visual journalism community. Since its founding in 1946, the NPPA has

---

[1] Pursuant to the Court's Order, all parties have consented to the filing of this amicus brief.

been the Voice of Visual Journalists, vigorously promoting the constitutional and intellectual property rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.

**DIGITAL MEDIA LICENSING ASSOCIATION ("DMLA")** represents the interests of digital licensing entities that offer for license millions of images, illustrations, film clips, and other content on behalf of thousands of individuals to editorial and commercial users.  DMLA advocates to ensure copyright protection for content to ensure a fair licensing economy.

## II. INTRODUCTION

Copyright protections are a fundamental principle of American law, and are the backbone of, and catalyst for, creative output in the United States. No company, no matter how large, can unilaterally block the avenues that allow copyright holders to protect their works.

The protection afforded copyright holders stretch back to the text of the Constitution itself. *See* U.S. Const. Art. I, §8, Cl. 8. Precedent in both law and equity prevent the theft and infringement of copyrighted works, and Congress has acted multiple times over more than 200 years to ensure these protections remain stalwart.[2]

The arc of legislation is to remove the barriers to protecting one's intellectual property, not erect new ones. The Digital Millennium Copyright Act ("DMCA"), enacted in 1998, is one such example. As part of this amendment to the Copyright Act of 1976, Congress took a measured, yet clear, approach. With the rise of new platforms of communication, and the concern that those platforms needed protection, the DMCA proscribed a path to safe harbor for these companies—if they adhere to the most basic of responsibilities, they will have this protection, and the balance sought by Congress will be achieved.

This motion concerns a decision by one such platform to disregard the obligations put on it by the DMCA and appoint itself the arbiters of what conduct is infringing and what claims have sufficient merit. That Platform, Twitter, must be

---

[2] For example, the Copyright Act of 1790 and its subsequent statutory amendments extended the term of protection and expressly protected photographs; the Copyright Act of 1909 and its progeny established the compulsory mechanical license and the right of the author to terminate transfer; and the current Copyright Act of 1976 took great leaps in author protection extending the term to life of the creator plus 50 years (later extended further to 70 years) and made other changes to keep U.S. law in line with its international peers.

held to account. To do otherwise would undermine the goals of the Copyright Act and hurt the very creators and copyright holders who rely on the provisions of the DMCA to make their living, operate their businesses, and simply survive in a marketplace where infringement becomes easier with every new technological advance. Copyright holders deserve better.

In this case, Twitter has decided to ignore its unambiguous obligations under Rule 512(h), and to instead assert a third-party claim of "fair use" that it has no legal right to assert. Unfortunately for Twitter, its desire to protect anonymous infringers on its platform cannot change the requirements of § 512(h). Judge Ryu evaluated this situation correctly when Bayside's motion to compel was granted. This Court should not only uphold that ruling, but find Twitter's objections to be entirely improper.

## III. <u>ARGUMENT</u>

Twitter has taken it upon itself to decide that a copyright holder should not receive information necessary to protect its copyrights—information that Congress and the Clerk of Court have obligated Twitter to provide. Twitter is egregiously seeking to shield an accused infringer without any right to do so and based on phantom concerns. Its position is a dangerous affront to copyright holders everywhere and must be rejected.

### A. Upholding Bayside's rights and protections as a copyright holder is critical.

Twitter's efforts to eschew its obligations under § 512(h) rest largely on its dangerous suggestions that Bayside somehow should not be entitled to the same copyright law protections afforded all holders of a validly created copyright. But Bayside is a copyright holder like any other and Twitter is obligated to comply with its properly issued § 512 subpoena.

Since its inception, copyright law in this country has had a guiding principle: balancing the rights of the creator and copyright holder with the public good. This fact is supported by the Congressional Record when discussing the foundations of the Copyright Act of 1909.

> The main object to be desired in expanding copyright protection accorded to music has been to give the composer an adequate return for the value of his composition, and it has been a serious and difficult task to… accomplish the double purpose of securing to the composer an adequate return for all use made of his composition and at the same time prevent the formation of oppressive monopolies, which might be founded upon the very rights granted to the composer for the purpose of protecting his interests

H.R. Rep. No. 2222, 60th Cong., 2nd Sess., p. 7 (1909)

This balance has been consistently reaffirmed in each subsequent iteration of copyright legislation. Among the most recent of those affirmations is the DMCA, through which Congress sought to balance the protections of copyright holders with the public benefit inherent in worldwide digital platforms.

The incentive to create underpins both the creative output of the country, and it reflects the importance of these protections at a core level. Members of the associations who comprise *amici* in this matter illustrate this principle aptly. Were a photographer to take an image today, and tomorrow find that same image disseminated across the globe with no possible remedy, recompense, or acknowledgement, that photographer would quickly need to look for another profession. Copyright law doesn't stifle creativity or any other right. Rather, it is the catalyst that allows creativity to flourish.

Copyright holders find equity through the means outlined by Title 17 and the DMCA. Yet, at each turn here Twitter has fought to protect and mask an alleged infringer in violation of its obligations under 17 USC § 512(h). If Twitter were to

prevail, these provisions of the DMCA would be meaningless. The copyright holder in this case is not asking for the extraordinary. It is simply reading the plain text of the statute and following the letter of the law. Twitter's efforts to erect additional barriers for reasons all its own are detrimental to copyright holders and the carefully balanced equities in the Act and should be rejected.

### B. Copyright holders like Bayside have a statutory right to obtain the "identification of an alleged infringer" from a service provider.

Once a service provider like Twitter has received a properly issued 512(h) subpoena, it is obligated to promptly comply with that subpoena. It must do so in this case.

There does not appear to be any dispute that Bayside properly requested and received authorization from the clerk of this Court to issue a subpoena to Twitter requiring it to expeditiously disclose information sufficient to identify the alleged infringer, per 17 USC § 512(h)(1)-(4). Thus, Bayside has met its initial burden to unearth the identity of the alleged infringer who is otherwise hiding behind the cloak of an anonymous online user profile.

17 USC § 512(h)(5) provides:

> "Upon receipt of the issued subpoena, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), *__the service provider shall expeditiously disclose to the copyright owner__* or person authorized by the copyright owner *__the information required by the subpoena__*, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification."

The language of § 512(h) is unambiguous, and provides no exceptions. Indeed, it is written to make clear that the disclosure of the requested information must be made "*__notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.__*" 17 U.S.C. § 512(h)(5).

1
2
3
4

In clear violation of § 512(h), Twitter has refused to identify the alleged infringer. As further discussed below, its apparent basis for so doing in an unjustifiable affront to copyright owners everywhere. As with any other copyright owner, Bayside's subpoena must be enforced.

5

**C. Twitter may not invoke fair use to thwart a Section 512(h) subpoena.**

6
7
8
9

Fair use is an affirmative defense to infringement that is brought by a defendant who otherwise is an infringer. A determination of the correct application of this defense is the work of the courts, not the unilateral work of service providers served with § 512(h) subpoenas.

10
11
12
13
14
15
16

Copyright holders seeking to enforce their rights against third party infringers should not have to fight with service providers who otherwise purport to be neutral and seek immunity from infringements on their platforms. Having been served with a proper 512(h) subpoena, service providers like Twitter must not be permitted to ignore the plain language of the DMCA and instead throw up roadblocks to copyright enforcement.[3]

17
18

19
20
21
22
23
24
25
26
27
28

[3] Twitter has a disturbing history of seeking the benefits of DMCA protection while simultaneously seeking to deprive copyright owners of the DMCA's benefits. For example, Twitter was recently sued for contributory copyright infringement in *Stross v. Twitter, Inc., et al*, 2:21-cv-08360-SVW-E after failing to remove dozens of unauthorized uses of the plaintiff's photographs despite three DMCA-compliant takedown notices emailed to its registered DMCA agent in March, April, and September 2021. Earlier this year it filed a motion to dismiss that claim (Id., dkt. 24), making the absurd argument that because it *set up its DMCA designated agent email address to "remove" and refuse to consider attachments*, it cannot be charged with knowledge of those infringements (and thus cannot be contributorily liable for them). After Stross pointed out that Twitter has *no* authority to either limit the reporting methods that complainants use and/or effectively reject DMCA-compliant takedown notices sent to its registered agent (Id., dkt. 27), Judge Wilson denied Twitter's motion (Id. dkt. 32).

### a. No authority permits it to invoke fair use.

Section 107 of the Copyright Act codifies the doctrine of fair use and establishes that fair use "is not an infringement of copyright." But as this Court is aware, what constitutes fair use is a question of significant disagreement—so much so that in one recent case high profile case the trial court found that the use by the Andy Warhol Foundation of Lynn Goldsmith's otherwise protectable photograph of the artist Prince was fair as a matter of law, just to have the Second Circuit reverse that judgment, finding the use was not transformative enough to be fair use. *The Andy Warhol Foundation for The Visual Arts, Inc. v. Lynn Goldsmith, et al.*, 11 F.4th 26 (2nd Cir. 2021). And just last week the Supreme Court took that case up for review to, hopefully, offer some clarity as to when the unauthorized use of a photograph may be fair use.

Fortunately, this Court can steer clear of the muddy waters of fair use in deciding this motion since § 512(h)(5) *requires* a service provided served with a duly issued subpoena to "expeditiously disclose to the copyright owner… the information required by the subpoena" *notwithstanding any other provision of law*—such as, for example, § 107 of the Copyright Act or Federal Rule of Civil Procedure 45(d)(3) ("Quashing or Modifying a Subpoena").

*Amici* believe this is a critically important point. A § 512(h) subpoena is distinct from a subpoena issued under Rule 45 and is not subject to the same challenges as a Rule 45 subpoena. 17 USC § 512(h)(5) does not authorize a service provider to argue fair use on behalf of third-party users or, indeed, challenge a subpoena served on it pursuant to that section at all.

Congress—fully aware of the defense of fair use elsewhere in the Copyright Act—could have given service providers the right to assert fair use on behalf of a user in response to a § 512(h) subpoena but didn't. "It is well settled that where Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker*, 533 U.S. 167, 173, 121 S. Ct. 2120, 2125 (2001); *Fox TV Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1009 (9th Cir. 2017) (noting that if Congress intended a copyright provision to be as broad as a defendant proposed "it would have been easy enough for Congress to say so"). In other words, the absence of language in a statute has as much effect as the presence of language.

And even a § 512(h) subpoena were subject to a Rule 45 motion to quash, it would be the exceedingly rare case in which service providers had valid grounds to seek to quash or modify a subpoena since, like Twitter in this case, service providers will be unable to establish undue burden or that any of their privileged or protected information is implicated. See Rule 45(d)(3)(A)(i)-(iv). Notably, Rule 45 does not set forth the possibility that the infringer may prevail on a "fair use" defense as a basis to quash a subpoena seeking the identity of that infringer. And, of course, copyright infringement is not protected by the First Amendment.

Equally important is that § 512(h) does not limit the issuance of a subpoena to a service provider to cases in which the infringement is proven. Rather, it requires the service provider to identify any *alleged* infringer identified by a copyright holder in its 512(c) takedown notice and in its 512(h) subpoena request. Again, the intent of Congress must be given weight. By including the word "alleged," Congress clearly intended the subpoena provision to include alleged infringers who may not ultimately be deemed infringers. *See Duncan v. Walker*, 533 U.S. 167, 174 ("It is our duty 'to give effect, if possible, to every clause and word of a statute."). Thus, even if service providers could demonstrate that their anonymous users had a possible fair use defense, it would do nothing to excuse that provider (here Twitter) from its statutory obligation to comply with the subpoena.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Because no authority, statutory or otherwise, permits Twitter to argue fair use in a case in which it is not alleged to be responsible for that use and is not a defendant, its efforts to quash Bayside's subpoena must be rejected.

### b.  Service providers like Twitter must comply with Section 512(h) in order to secure DMCA protection.

While the DMCA may not work perfectly, the idea underlying it is a good one—in order to both help copyright owners enforce their rights online and prevent service providers from being sued out of existence (given the otherwise strict liability nature of copyright infringement), Congress has required service providers to cooperate with copyright holders in addressing infringement on their platforms in exchange for protection from liability for those infringements. Thus, § 512(c) permits service providers, e.g., YouTube or Google, to avoid copyright infringement liability for storing user content if—among other requirements—the service provider "expeditiously" removes or disables access to the content after receiving notification from a copyright holder that the content is infringing. 17 U.S.C. § 512(c). Similarly, § 512(h) requires service providers to provide information regarding alleged infringers upon being presented with a duly issued subpoena.

The balance of the DMCA will be significantly imbalanced if service providers, who unquestionably profit from the proliferation of infringing content on their platforms, are permitted to rebuff the efforts of copyright holders to enforce their rights. Twitter's stated concern for protecting free speech and fair use argues a phantom problem—copyright claimants abusing the process to attack fair uses—since copyright holders taking action under Section 512 are already obligated "to consider whether the potentially infringing material is a fair use of a copyright under 17 U.S.C. § 107." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016).

Indeed, the *Lenz* holding clarified that a copyright holder that issues a takedown notice without first forming a good faith belief that the offending use was not fair use could be subject to liability under Section 512(f), which specifically permits a service provider to seek damages, including attorneys' fees, should it ultimately come to light that the complaining copyright holder knowingly misrepresent that the material at issue is infringing. Thus, service providers, like Twitter here, have meaningful protection and assurances that the takedown notices and subpoenas served on them have considered fair use.

Once a service provider receives a 512(c) compliant takedown notice is required to remove the complained of content in order to be insulated from suit by the copyright holder. To avoid liability for disabling or removing content, the service provider must notify the user of the takedown. *Id.* § 512(g)(1)–(2). The user then has the option of restoring the content by sending a counter-notification, which must include a statement of "good faith belief that the material was removed or disabled as a result of mistake or misidentification...." *Id.* § 512(g)(3)(C). Upon receipt of a valid counter-notification, the service provider must inform the copyright holder of the counter-notification and restore the content within "not less than 10, nor more than 14, business days," unless the service provider receives notice that the copyright holder has filed a lawsuit against the user seeking to restrain the user's infringing behavior. *Id.* § 512(g)(2)(B)–(C).

Section 512(h) must be interpreted the same way, especially after a copyright holder has gone through the § 512(c) procedures, since the offending end-user will be on actual knowledge of the claim(s) at issue and will have been afforded the opportunity to defend the case. There is nothing in the DMCA that permits an online service provider to refuse to comply with a subpoena by arguing fair use where the user has received notice of the claim and refused to defend itself.

The justification for giving a service provider insulation from any liability for infringement is that it is unaware of the infringement and should not be responsible for it. But there is no justification in giving a service provider the ability to actively protect infringers who refuse to defend themselves, all while disclaiming any liability for the actions of those infringers.

### c.  Service providers are poorly positioned to advocate fair use.

Section 512(h) provides no mechanism for service providers to challenge subpoenas issued under that section. That should be dispositive of this matter. But even if it were not, this Court should reject Twitter's attempt to act as a surrogate for the accused infringer because such surrogacy has other practical problems and implications, including the service provider's inability to meaningfully address the fair use factors and questions of whether the anonymous user would be bound by the Court's determination (or, conversely, whether the copyright holder would need to relitigate the fair use question multiple times).

 "[T]he Supreme Court and [Ninth C]ircuit have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use," *Dr. Seuss Ent. L.P. v. ComicMix LLC*, 983 F.3d 443, 459. Yet in many (if not most) cases providers will be unable to intelligently address fair use as they will have an incomplete understanding of three of the four non-exclusive fair use factors enumerated in § 107 of the Copyright Act of 1976. Thus, service providers should not be permitted to advance a fair use defense where it is not a defendant and has no information about the alleged infringement beyond what can be seen on its platform.

For example, it will be the rare case that a service provider can tell from a user post what the intended purpose and meaning of the accused infringer was in creating the work, and thus the service provider cannot properly address the first statutory factor which examines "the purpose and character of the use, including

whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). In evaluating this first fair use factor Courts consider, *inter alia*, whether the offending work does more than merely repackage the original work, i.e., whether it offers "new information, new aesthetic, new insights and understanding" or whether it lends "new expression, meaning, or message" to the original work. *Dr. Seuss Ent. L.P. v. ComicMix LLC*, 983 F.3d 443, 453 (9th Cir. 2020) (citing *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164; *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013); Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990)). Service providers have no greater insight into the information, meaning, or message the offending work is intended to convey, and thus are no better equipped to address the first factor, than any other member of the public.

The third statutory factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" favor fair use. 17 U.S.C. § 107(3). Again, service providers will often have no more information available to them than what is contained in the offending post. Whether that post is showing part of a book, a frame from a film, or something else the service provided will likely not know what portion of the whole offending work the infringing use constitutes. Indeed, it may not even be able to determine how much of the copyright owner's work was used in the offending work if what appears on the service provider's platform is not the entirety of the offending work.

Similarly, the fourth and final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Courts must address "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market' for the original" and "the

market for derivative works." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (quotation marks and citations omitted). Again, service providers will have very limited knowledge of the business ventures of their anonymous user, the full scope of uses of the allegedly infringing post, or how those uses will impact the potential market for or value of the copyrighted work.

Service providers make extremely poor surrogates for online infringers in addressing fair use, and permitting them to so act has potentially significant collateral estoppel and other implications. Thus, providers like Twitter should not be permitted to invoke and argue fair use to quash or limit Rule 512(h) subpoenas.

## IV.   **CONCLUSION**

The creative fabric of society is woven by the copyright holders, photographers, illustrators, designers, and other artists whose livelihoods depend on the protections afforded them by the Copyright Act and the DMCA. *Amici* represent tens of thousands of such copyright holders—individuals and companies across the country that play within the rules set by the DMCA. All they ask is that service providers like Twitter also comply with the requirements of the DMCA and not be allowed to frustrate copyright enforcement. *Amici* respectfully request the Court deny Twitter's motion and affirm Judge Ryu's order.

Dated:        April 4, 2022                 Respectfully submitted,

                                            Stephen M. Doniger_____
                                            Stephen M. Doniger, Esq. (SBN 179314)
                                            stephen@donigerlawfirm.com
                                            **DONIGER / BURROUGHS**
                                            603 Rose Avenue
                                            Venice California 90291
                                            Telephone: (310) 590-1820

Thomas Maddrey, General Counsel
**AMERICAN SOCIETY OF**
**MEDIA PHOTOGRAPHERS, INC.**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
maddrey@asmp.org

*Attorneys for Amici Curiae*

AMICI CURIE BREIF