UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:                          )  No. 20MC80214-VC
                                )
DMCA SUBPOENA TO TWITTER,       )
INC.                            )
_____)

                                San Francisco, California
                                Thursday, May 12, 2022

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
          RECORDING 2:39 - 3:58 = 79 MINUTES

APPEARANCES:

For Twitter:
                        Perkins Coie
                        500 North Arkard Street
                        Suite 3300
                        Dallas, Texas 75201
                        (214) 965-7700
                  BY:   HAYDEN SCHOTTLAENDER, ESQ.

                        Perkins Coie
                        1201 Third Avenue, Suite 4900
                        Seattle, Washington 98101
                        (206) 359-8000
                  BY:   JULIE SCHWARTZ, ESQ.

For Bayside:
                        Glaser, Weil, Fink, Howard,
                          Auchen & Shapiro, LLP
                        10250 Constellation Boulevard
                        Floor 19
                        Los Angeles, California 90067
                        (310) 553-3000

          (APPEARANCES CONTINUED ON NEXT PAGE)

*Echo Reporting, Inc.*

APPEARANCES:   (Cont'd.)

For Public Citizen:
                              Public Citizen Litigation
                                 Group
                         BY:   PAUL A. LEVY, ESQ.


Transcribed by:               Echo Reporting, Inc.
                              Contracted Court Reporter/
                              Transcriber
                              echoreporting@yahoo.com

Thursday, May 12, 2022                                    2:39 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Now calling 20-MC-8214, In Re DMCA Subpoena to Twitter, Inc.

Will all counsel please state your appearances for the record, starting with the petitioner.

MR. SCHOTTLAENDER (via Zoom):  Good afternoon, your Honor.  This is Hayden Schottlaender and Julie Schwartz from the firm Perkins Coie, here on behalf of Twitter.

MS. SCHWARTZ (via Zoom):  Good afternoon, your Honor.

THE COURT:  Afternoon.

MR. HADLEY (via Zoom):  Good afternoon, your Honor.  Lawrence Hadley of Grazer Wile for Bayside.

THE COURT:  Hello.

MR. LEVY (via Zoom):  And this is Paul Alan Levy from Public Citizen Litigation Group, appearing for Public Citizen, and thank you for hearing us.

THE COURT:  Oh.  You're welcome, although I'm not really sure how much I'm going to have to hear you because I have to say that your brief may be the most helpful brief I've ever read, and I agree -- agree with every -- I think I agree with everything in it except possibly one sentence, one minor issue in one sentence.

4

So, I -- I think it's going to be on both sides to explain why I shouldn't just follow the approach that you recommend.

MR. LEVY:  I have one correction to a citation that I made in error that I --

THE COURT:  Okay.

MR. LEVY:  -- would like to call to the Court's attention at an appropriate time.

THE COURT:  Go ahead.

MR. LEVY:  So, on page -- let me get the right reference here.  On page 12 and footnote five of our brief, I represented that there are no cases outside the Second Circuit that apply Sony, the Sony Music standard other than in a mass downloading case, and there are actually three counterexamples that I can cite to the Court.  One is the -- a copyright case filed over the posting of nude photographs for the alleged purpose of extortion, the M.C. Geiger case in the Middle District of Florida.  Another is a suit about a bootlegging operation in the District of Minnesota, Paisley Clark v. Zianni (phonetic), and finally a defamation case.  There's a long footnote in that case in the Eastern District of Pennsylvania, and I regret overlooking those cases when I looked at the 382 citations.

But, other than that, those are the only exceptions of which we're aware outside the Second Circuit.

5

THE COURT:  Not a problem.  The only -- the only -- since I have you, the only very slight issue that I had with one sentence in your brief was you -- you know, when you talk about the balancing stage, you -- you say that it should be treated like a -- a -- you know, like the balancing of hardships on a motion for preliminary injunction, and I think the problem with that is this may not have been true when you wrote the -- you first filed this -- you know, the first version of this brief way back when.  But nowadays, you know, it's clear that the -- the burden is squarely on the Plaintiff to demonstrate that the balance of hardships tips in their favor, and I think you probably wouldn't say that -- that the burden is squarely on one side or the other in demonstrating that the balance of hardships tips in their favor in this context, right?

MR. LEVY:  You know, we see the dendrite -- and I have to emphasize it's Dendrite and not Highfields that we contend for.

THE COURT:  Right.

MR. LEVY:  We think it's a -- the balancing affects the closed cases, and if the case is clear in one direction or the other, that side prevails.  Whether it's a burden at -- the Petitioner who's the Petitioner here, Lawrence Hadley, Bayside or is the Petitioner the -- following the motion to quash.  I don't know how to answer

6

that question in light of the point that your Honor is making.

THE COURT:  Well, and I think the problem, you know, is that, you know, there -- there are some things where, you know, the party seeking the subpoena, if the other -- you know, if the other side doesn't respond, there's -- there's some things where the -- the party seeking the subpoena isn't going to be able to, you know, "meet their burden" and that's not their fault.

MR. LEVY:  Right.

THE COURT:  And kind of vice versa, right.  There are some things where the -- you know, where you may still need to consider the interests of the anonymous speaker, even if the anonymous speaker doesn't show up.

MR. LEVY:  Right.

THE COURT:  Obviously, they can't meet their burden, but the Court still has to consider it.  And, so, it doesn't really make sense to speak in terms of who has the burden at the balancing stage I would say, and I think that's what you were saying in your brief.

MR. LEVY:  I would agree.

THE COURT:  Yeah.  Okay.

MR. LEVY:  I'm going silent.

THE COURT:  Okay.  Feel free to speak up if you have anything else to offer, but I guess maybe I should put

it first to Mr. Hadley and to Bayside.  You know, why isn't Public Citizen exactly right on how, you know, this issue should be adjudicated?

MR. HADLEY:  Your Honor, can I share my screen? I've prepared some slides that go through that.

THE COURT:  As long as you're responding to my question and not just trying to shoehorn a pre-prepared presentation in to respond to my questions.

MR. HADLEY:  Sure.  Okay.  My screen should be up. And, your Honor, in response to my question, the reason why -- I mean, certainly we agree with Public Citizen on the burden of proof issue, and -- and the main reason we do is because the speaker here did not show up to defend him or herself.  And we think that Magistrate Judge Ryu was correct that without the -- the accused infringer here, there's really a lack of evidence.

In Twitter -- what we have from Twitter --

THE COURT:  Well, that's not what Public Citizen said.  So, don't -- don't say you agree with Public Citizen, because what Public Citizen says is that it's -- you know, that's not necessarily the end of the matter if the anonymous speaker doesn't show up.  There are lots of reasons why anonymous speakers wouldn't -- wouldn't respond. And, you know, the fact that the anonymous speaker has not responded in this case I don't think is dispositive of

8

whether the motion to quash should be granted.

MR. HADLEY:  Sure.  I understand.  But the -- the issue that Magistrate Judge Ryu --

THE COURT:  You know, I'm reviewing this de novo. So, let's just speak in terms of what the right answer should be and not -- we don't need to work off of Judge Ryu's opinion.  I'm just -- I'm supposed to review this de novo, and that's what I'm doing.

MR. HADLEY:  And the right answer is one that we're dealing with, Section 512 of the DMCA.  And under Section 512 of the DMCA, no court has ever found that a service provider has standing to assert First Amendment or Fair Use Rights on behalf of an anonymous speaker.  In -- in opposing identification of that speaker under Section 512(h) --

THE COURT:  The Public Citizen briefs cites a litany case where a court allowed service providers like Twitter to assert the rights of users.

MR. HADLEY:  Not in response to a Section 512 subpoena.

THE COURT:  Why should that be different?

MR. HADLEY:  Because of the statutory language of Section 512.  So, what -- what the Court -- what the Ninth Circuit has said in the Lenz case, is that a -- the anonymous user or the -- the alleged infringer can show up

9

and challenge fair use to the takedown notice on the grounds of fair use and that once that issue has been decided, there is -- in fact, I can go to the language here of Section 512, that in response to the takedown notice, the complaining party has to have -- provide a statement that it has a good faith belief that the use of the alleged infringing material is not authorized by law.  That is clear under the Lenz case and the Lenz case, in fact --

THE COURT:  What does that have to do with whether -- I don't understand what that has to do with whether Twitter has standing to oppose -- move to quash the subpoena based on, you know, the idea either that it's fair use or that the -- the party seeking a subpoena has not shown that the -- it's appropriate in this context for the -- for the speaker's identity to be deanonymized (sic).

MR. HADLEY:  Two reasons, because once the -- once fair use has been raised, if it's been raised in response to the takedown, there's no option under Section H to raise fair use or any other defense by the service provider.  The section specifically says that the service provider, once the issue has been resolved under the takedown notice of fair use and good faith belief and so forth, that the service provider shall expeditiously disclose the information requested, comply with the subpoena, notwithstanding any other provision of law.

10

THE COURT:  So, you're saying notwithstanding the First Amendment?

MR. HADLEY:  Correct.  And then if you go to the standing issue, so, standing has three elements.

THE COURT:  Okay.  Let's just take down the -- let's just take down the slides, because you don't need to have a slide with the elements of Article 3 standing.  I mean, I -- those are cited to me every day.  Let's just have a conversation about it.  Okay?

MR. HADLEY:  Sure.  So, the -- so, first of all, Twitter has not pointed to any actual imminent or non-conjectural injury that it will suffer if the subpoena is not granted.  There's nothing in the record on any injury that Twitter is going to suffer.  That's the first point.

The second point is that under the law of standing, you have to show a close relationship --

THE COURT:  But hold on.  You've issued a subpoena to Twitter, right?

MR. HADLEY:  Right.

THE COURT:  And then -- so -- so, the -- the harm to Twitter is that it -- the harm is compliance with the subpoena in a situation where it doesn't believe that it should be required to disclose the identity of one of its users, somebody who has -- it has a business relationship with.

I don't -- I don't understand.  I mean, I have to say, I mean, I would not spend too much time focusing on the standing argument because I don't think you're going to convince me that Twitter doesn't have standing to -- to move to quash the subpoena.

MR. HADLEY:  Well, I would just point out that in exchange for complying with the subpoena, Twitter gets immunity.  So, it does get something in return.  And the -- and, again, there's no evidence of a close relationship.  And the bottom line is that there's no case law authority that holds that a service provider has standing to assert fair use on behalf of an alleged copyright infringer in moving to quash a Section 412(h) subpoena.  The --

THE COURT:  Can we -- I don't -- I don't think you're going to convince me on the standing issue.  Can we -- can we move to the question I asked, which is why isn't Public Citizen exactly right about the way I should approach this in applying the Dendrite test?

MR. HADLEY:  Because if you apply the Dendrite test or the -- the Dendrite test and you balance the respective harms, there's nothing to balance on the side of -- of Twitter, because, first of all, there is no evidence of any obvious relationship between the photo -- copyrighted photographs at issue and the commentary or the work.  That -- that is a prerequisite to --

12

THE COURT:  Sorry.  I didn't -- say that one more time.  I want to make sure I -- I'm not sure I understood.  So --

MR. HADLEY:  So, the tweets at issue have two things.  They have commentary about an individual.  Flattery or not, that's not the issue.  And then the second thing they have is a copyrighted photograph that belongs to Bayside.

In all of the cases dealing with fair use, there is some relationship, some reason to use the copyrighted material in connection with the speech, and the relationship is either obvious, you can see it or it's supplied by the accused infringer.  Here there is no obvious relationship.  There's no relationship apparent whatsoever between the photographs that belong to Bayside and the commentary.  Whoever Moneybags is could have used a photo from any source.  It could have used a photo of JLo or the Mona Lisa or anything else.

THE COURT:  But whatever photo was used, I mean, I guess I don't quite understand your comment about it not having a relationship to the -- the post or the message of the -- of the speaker.  I mean, the speaker is saying, Look, this person -- I can't -- what's this person's name, the billionaire?

MR. HADLEY:  Mr. Seth or Sheth or something like

that.

THE COURT:  Like Brian Sheth or something like that?

MR. HADLEY:  Brian Sheth, Sheth, yeah.

THE COURT:  Okay.  The -- the speaker is saying that this billionaire, Brian Sheth, is using his billions to cheat on his wife with attractive young women, and his -- the speaker is posting photos of attractive young women scantily clad.  I mean, why is there no connection between the image and the message?

MR. HADLEY:  Because we don't know whether there's any connection.  I mean, the -- that's the problem.

THE COURT:  Isn't -- doesn't it jump off the page?

MR. HADLEY:  I don't think so at all.  It's not even close.  There -- first of all, there are many different pictures of different women in -- in different types of poses, and the speaker never says that this is a person in a relationship or this is some person that's somehow connected.  It just says "Meet the future," undisclosed time, undisclosed place, undisclosed anything else, the future Ms. Sheth or Seth.  Who knows what that --

THE COURT:  And it has a picture of an attractive woman, right?

MR. HADLEY:  And that picture of an attractive woman could have been anything.  It could have been a dog.

14

It could have been -- it doesn't have to even be --

THE COURT:  Well, if it were a picture of a dog, then I would -- then I might be more likely to -- to agree with you that there does -- there's no apparent connection between, you know, the -- the image of the dog and the message that the speaker is -- is trying to convey.

MR. HADLEY:  Well, it could have been any person. it could have been JLO.  It could have been Michelle Pfeiffer.  It could have been any attractive woman, anybody who would license their rights.  And, in fact, if the speaker had come to Bayside --

THE COURT:  Could I ask you how do you know that there's no connection between the image of the women and the message?

MR. HADLEY:  Well, I don't know Mr. Seth.  So, I -- I can't tell.  But what I do know and what ends up being the most important is that there --

THE COURT:  I didn't ask you if you know him. You're sort of quick to say that.  I didn't ask that.  I said --

MR. HADLEY:  I -- I --

THE COURT:  I asked you how do you know that there's no connection between the -- the images and the -- and the message by Money -- that Moneybags was articulating?

MR. HADLEY:  Well, because -- I guess I say that

15

there is nothing in the tweets that jumps out at me or -- you know, and I know that this is de novo review, but there was certainly nothing that jumped out at the Magistrate Judge that made that connection.  But the bottom line is that there's no evidence.

So, Twitter -- and -- and this is maybe where the burden of proof comes from --

THE COURT:  Well, where did -- where did the -- where did -- who -- who are those people in those photos, and --

MR. HADLEY:  We'd love to know.  I don't know.

THE COURT:  Well, wait a minute.  You represent the copyright holder.

MR. HADLEY:  Well, we represent the copyright holder that owns it, but the copyright owner doesn't actually know the names of the individuals.  It bought the pictures for aesthetic reasons to licensing.  And it doesn't have to know the subject of who is actually in the photograph or not to be able to have value of those photographs and to license them.  They're -- Bayside owns hundreds and hundreds of photographs of all different sorts and doesn't know the names of every subject that is in the photographs.  It is in the business of licensing those photos.

But I guess the --

16

THE COURT:  We'll get to -- we'll get to Bayside more in a minute, but what -- I mean, it seems to me that there -- you know, there is a very -- you know, a fair use defense.  I mean, if you're -- if you're engaging in issue spotting and you look at these images and you're told that these -- that these images are -- have copyright protection, the very first question you would ask is, hmm, this seems like it might be fair use.  Need to learn more about this to figure out if this is fair use.

And it seems to me that you haven't done much of anything to, you know, explain why it's not fair use.  And, you know, if we're applying sort of the approach that Public Citizen is suggesting, which seems quite right, it's -- you know, that's part of what you need to do in kind of satisfying me that you have a legitimate colorable claim here that you -- that you have a legitimate chance of winning.  I don't know if I'd go so far as to say you have to show that you have a likelihood of success on the merits.  Maybe -- maybe you do, but at a minimum, you got to show that you have a legitimate colorable claim here that has a legitimate chance of winning, and you've -- you've said very little about fair use.

MR. HADLEY:  Well, you're correct in that under Section 512(c), before sending the takedown notice, that Bayside had to make an evaluation and satisfy itself that it

17

had a legitimate prima facie copyright claim, including under the Lenz case, that there was no fair use. And it did that. And, in fact, it provided the requisite affidavit explaining why that there was a prima face of copyright infringement which included a good faith determination of no fair use.

There was no apparent --

THE COURT: Provided to -- to Twitter?

MR. HADLEY: Correct. And there was -- and -- and that is because, in looking at the text of the tweets -- and there was only one tweet that even came close to linking the commentary to the photograph, and that is the one that said "Meet the future Ms. Brian Sheth." I mean, that could be 20 years in the future. There was nothing in that that said anything about the photograph and the commentary, and that's sort of the problem that we have here is that if -- Twitter doesn't provide any evidence of the -- the question --

THE COURT: But this is a special case because this is a case in which a company is seeking to obtain the identity of an anonymous speaker, and you can't just treat it like a straight, you know, copyright fair use issue when -- well, you can't -- I should put it this way. You can't treat it like a straight DMCA subpoena without any sort of additional overlay to protect the anonymous speaker. And, you know, maybe what you did is adequate in the -- in the

18

typical copyright case, but here we have -- first of all, we have a motion to quash, and we have an anonymous speaker, and that's an interest that I have a responsibility to, you know, protect to the extent it's appropriate to protect it. And part of protecting that interest, it seems to me, is you making some kind of showing to me that it's not fair use. And I'm just -- it's not clear to me that you've done that. All you keep saying is we don't have enough -- we don't have information. We don't know. We don't know. But I don't think that's enough in that context. I mean, it's -- you've got a -- you've got to make a showing that you have a valid copyright claim, a legitimate copyright claim, and because fair use jumps off the page, I think you have to make some kind of showing that there's -- you know, that the -- the -- the prospective Defendant is not likely to win on fair use.

MR. HADLEY: Well, we -- first of all, in terms of a prima facie case, there's no dispute that I'm aware of on that. There's no dispute that Bayside owns the copyright, and there's no dispute that there was copying. And, so, that gets us directly into the prior use issue. And I would start with the premise that -- that --

THE COURT: I mean, I don't even have a complaint, right. I mean, I don't -- and I'm not -- I'm not saying you're required to draft a complaint, but in response to a motion to quash, you've got a -- you know, in a situation

where we have an anonymous speaker whose identity you're trying to uncover, you've got a -- you've got to show how you're going to win this case or how you are likely or -- or, you know, there's a significant possibility that you're going to win this case, and I just don't know if you've done that.

MR. HADLEY:  And we can't bring a copyright case. We can't even draft one until we know who this person is.

THE COURT:  That's not true.

MR. HADLEY:  I mean, we can leave the person out I suppose.

THE COURT:  It happens all the time.  I mean, we -- it happens all the time in this District where a copyright holder will file a lawsuit against a Doe Defendant, and they'll lay out with significant specificity the claim that they have against the Doe Defendant, and then they will seek a subpoena in connection with that complaint they've filed.

I do wonder in a situation where we have an anonymous speaker if we should be even more concerned when the person seeking the subpoena has not even bothered to file a complaint.  I mean, I know you have the right to not file a complaint under the -- under the DMCA, but when you have an anonymous -- but oftentimes people do, you know.  And -- and -- and then they -- you know, they seek the identity of the

20

person who's posting the allegedly infringing images after they filed a lawsuit against a Doe Defendant.

MR. HADLEY:  And in almost every one of those cases, the Doe Defendant comes in anonymously if they are going to raise fair use.  And in every one of those cases, fair use is raised as a defense.  It's not an affirmative obligation in the complaint to plead no fair use on the --

THE COURT:  In the normal -- in the normal case that's true.  But, just like in the statute of limitations context -- excuse me.  Sorry about that.

MR. LEVY:  Glad it's you, your Honor, and not me.

THE COURT:  I was just going to say whoever's phone that was, get out of the courtroom right now.

You know, this happens with some frequency with affirmative defenses, right.  If -- if, you know, somebody files a complaint and a statute of limitations issue jumps off the page, right.  It's, yes, statute of limitations is an affirmative defense.  But, occasionally, you can -- you can resolve the issue on the pleadings in response to a motion to dismiss.  You know, there are other -- you know, I -- I think the courts sometimes resolve fair use on the pleadings as well, again, if it's sort of obvious that -- form the allegations in the complaint that fair use applies, and the -- you know, the additional overlay we have in this case that I keep repeating is that we have an anonymous

21

speaker, and there are, you know, questions about why this subpoena has been issued, and there are questions about what is going to be done if the -- if -- if Bayside and whoever is connected with Bayside learns the identity of the speaker, and you have -- so, you have this very real first amendment concern overlaying the adjudication of this motion to quash.  And in that context and when fair use jumps off the page, I don't see what's wrong with saying one of the things you have to do to get this subpoena is explain why, you know, my initial react that fair use applies here is -- is probably wrong.

MR. HADLEY:  Well, we may have a potential fair use issue or First Amendment Rights issue because we don't even know if this speaker is a U.S. citizen or otherwise entitled to First Amendment Rights.  We know nothing about this speaker at all, and that really leads back to the problem.  We're looking at all of the fair use factors --

THE COURT:  I wonder if Twitter can tell us that.  Does Twitter know if -- does Twitter know if this speaker is U.S. based?  Are you dividing yourself up among countries?

MR. SCHOTTLAENDER:  Your Honor, I'd have to talk to our client a bit more about that.  Of course, determining location would be quite difficult I believe, just because of how IP addresses can be bounced and modes and VPI's and stuff like that.

But this issue of -- of citizenship was one -- was one sentence, I believe, in Bayside's opposition, and so --

THE COURT:  Well, I mean, it's not -- it's -- it's not really worth the time.  I mean, if you look at all the person's tweets, it seems rather unlikely that they're not a U.S. citizen -- or not a U.S. resident.  So, anyway, I -- I just -- what -- Mr. Hadley, I don't know if you're -- I'm not sure you're answering my question.

What is wrong -- the question again is what is wrong in a context like this where we have legitimate serious First Amendment concerns with requiring you to, you know, alleviate concerns about whether you really have a chance of winning this lawsuit?

MR. HADLEY:  I don't think there is anything wrong with inquiring about that.  In fact, that's te -- what we had to do before we even served the takedown notice.

THE COURT:  Okay.  So, have you briefed all the various factors of fair use?

MR. HADLEY:  We have extensively, your Honor.

THE COURT:  To me?

MR. HADLEY:  Yes.  They're all in our -- in our brief, and they're briefed extensively.

THE COURT:  Okay.  What did you say about the amount and sustainability of the portion used -- let's go to the next one.  What did you say about the effect of the use

23

upon the potential market for or value of the copyrighted work?

MR. HADLEY:  What we --

THE COURT:  What did you say about that?

MR. HADLEY:  What we said about that is that under Ninth Circuit law, regardless of whether you're dealing with a 512 situation or even if you're dealing with the situation where we filed the copyright claim and you're dealing with fair use, under any circumstance, the burden on the market is always on the person asserting fair use.  In this case, on the speaker.  And, in fact, that applies even when the speaker is anonymous.

And what we have here is an utter absence of any evidence whatsoever.

THE COURT:  Well, how can they do that?  I mean, we know nothing about -- how could -- even if -- even if -- even if Moneybags appeared and even if they appeared anonymously, right, with -- as a Doe, how could they possibly address of the use upon the potential market for or value of the copyrighted work?  You haven't told us anything about Bayside or what the market is or -- that's all stuff that you know, not stuff that Moneybags knows.

MR. HADLEY:  We have included that in the brief, your Honor.  We've said what Bayside is.  We've said that it owns a catalog of copyrighted photos.  We've said that it

24

licenses those photos, and we've said that by this anonymous speaker or alleged infringer helping himself or herself --

THE COURT:  Has Bayside ever licensed these photos to anybody?

MR. HADLEY:  I'm not sure if it's licensed these particular photos, but it has licensed similar photos to others.

THE COURT:  Uh-huh.

MR. HADLEY:  And we've explained that in the brief, and we have --

THE COURT:  So, we don't even know if Bayside has even licensed any of these photos to anybody?

MR. HADLEY:  Not these particular photos.  I'm not sure about these particular photos.

THE COURT:  And then how -- then doesn't that say a lot about the effect of the use of -- of these photos upon the potential market for or value of the copyrighted work?

MR. HADLEY:  Not at all.  They're -- they're -- because of the licensing activity that Bayside has engaged in with other photos, it suggests that there may very well have been a market to this photo.  In fact, had the speaker come to Bayside and asked to license these photos, Bayside would have considered it.  The problem is that Bayside never had the chance --

THE COURT:  Did Bayside even exist when -- when

25

the speaker was posting these photos?  I thought Bayside was -- Bayside was -- the speaker -- Moneybags was posting these photos in October of 2020, and Bayside was formed in October 2020, right?

MR. HADLEY:  Bayside existed -- was -- was -- Bayside was in existence prior to these photos being posted.

THE COURT:  Okay.  So, how soon?  How long prior to those being posed?

MR. HADLEY:  I'm not sure.  It was a --

THE COURT:  Public Citizen says that based on their search, Bayside was formed in October 2020, which was the same month that Moneybags started posting these photos, right?  And, by the way, if you go to Bayside's website and you -- let's say -- let's just say that Moneybags wanted to get a license from Bayside to use these photos, you go to Bayside's website, there is no address.  There is no contact information.  There is no name of a single human being. Frankly, it looks -- it appears at first glance to be a sham website.

So -- so, what -- do you -- do you really want to contend that Moneybags could have gone to Bayside to get a -- a license for these photos?  How would Moneybags have done that?

MR. HADLEY:  I -- my understanding is that there was contact information some place.  I don't have the

26

website up in front of me.

THE COURT:  Really?  Well, let's pull it up.
Let's go.  What's it called Bayside Advisory, LLC?

MR. HADLEY:  Yes.

THE COURT:  All right.  Baysideadvisory.com.  Go
ahead.  Pull it up.  You've got a computer there?

MR. HADLEY:  I do.  Let me --

THE COURT:  So, I pull that up, and it says
Bayside Advisory, LLC, and it has a few photos, kind of I
guess somewhat comparable to the ones that Moneybags was
using, and then it says, "Issues, campaigns, supporting
creativity."  And then it says "Supporting independent
creators."  And then it says, "Website copyright 2021, 2022
Bayside Advisory LLC."  And then it says "Page updated
January 2022."

I don't see anywhere I can -- any link I can click
onto.  I don't see any -- any link to any contact
information.  I don't see any name.  I don't see any
address.  I don't see any location.  I mean, this seems like
just a sham website to me.

Can you explain this -- this website and why this
website doesn't have any location information or contact
information or names of people behind the company or
anything?

MR. HADLEY:  I -- I don't know why it doesn't.

27

THE COURT:  So how is -- how is -- and it says copyright 2021.  So, maybe it wasn't even up.  Maybe it was too early in October 2020 for the website even to be up because the company was just formed.  Maybe it was formed hurriedly.  Maybe they weren't ready to have a website up.  But are you really telling me that Moneybags could have contacted Bayside Advisory to get a license for the photo?

MR. HADLEY:  Well, all I know is that Bayside has licensed some of its photos.  So, somebody was able to figure out how to contact them.

THE COURT:  Who -- who is Bayside?  When did -- so, that might be -- for example, if when you're getting to the balancing section of the Dendrite test, those might be the kinds of questions we would ask, right?  I might say, "Really?  Bayside has licensed other photos?  Let me see the license agreements.  Why don't you file them under seal, and I'll -- or I'll look at them in camera.  Let's see the license agreements.  Let's see if that's really true."

You know, I might -- we might have an evidentiary hearing, for example, to inquire who is really behind Bayside and why it was formed hurriedly, apparently without a website in October 2020, the same month that Moneybags started posting these photos anonymously.

MR. HADLEY:  Just one other point on the -- on the market, potential market is that the -- under Ninth Circuit

law, there is a presumption that a copyright infringement -- that when you meet the prima facie case of ownership and copying, that there is market harm, and one of the problems, again, is that --

THE COURT:  But you didn't even -- but Bayside didn't even obtain copyright protection for these images until after Moneybags took them down.  Isn't that true?

MR. HADLEY:  Yes.  And that's very common, your Honor, that you have copyright protection beforehand.  The -- the only thing that registration gets you is an ability to sue.  So, once we saw that these were being used without authorization, we copyrighted them, and that --

THE COURT:  Well, what about damages?  Do you -- do you -- are you able to seek damages given that Moneybags took down the images before you obtained copyright registration?

MR. HADLEY:  Royalty damages I believe.  We can't seek statutory damages.

THE COURT:  Okay.  And what's your -- what's your basis for -- what -- what would my basis be for thinking that you would have any royalty damages in ths case?  I mean, you say you don't even -- you don't even think that Bayside licensed the -- licensed the images to anybody.

MR. HADLEY:  Well, that goes far beyond any fair use analysis, regardless of whose burden it is on.  But the

29

way you would do that --

THE COURT:  You're right -- you're right about that.  I mean, I think it goes more to the question -- goes more to the balancing part of the test, right, where you're balancing -- you know, you're asking under these particular circumstances, you know, does it make sense.  Does it -- does it make sense to sacrifice this First Amendment interest in favor of the -- you know, the interest in this mysterious company Bayside to assert its -- it's copyrights.  And that -- I think there are a lot of questions to be asked during the balancing portion of the inquiry, including whether Bayside has made any -- whether there's any real possibility that Bayside could make any money from these images, who's behind Bayside, what is -- you know what -- which people does Bayside have connections to, et cetera.

MR. HADLEY:  You're correct, your Honor, provided you get to the balancing.  Again, our position is that you don't get there.  That's explained in our briefs.  The Ninth Circuit has never adopted balancing.  It's not in Highfields.  It is in Art of Living, but that is the only case, and it's in a State Court of New Jersey case.  But, assuming you get to balancing and you look at the harm to Bayside and you want to put a money -- you want to look at the monetary side of it, even though these specific photos have not been licensed, the way you would do it is look at

30

similar photos that have been licensed, and you would see what the license rate was for that, and you would do an analysis.  That is the way it always happens in copyright cases.  And I (audio glitch) include the other factors as well.  But, you know, again, part of the problem with -- with these factors is that we don't have the anonymous speaker or the alleged infringer here, and that alleged infringer was given an opportunity to come and explain all of this twice and did not take advantage of it.  It --

THE COURT:  I don't mean to -- I don't mean to suggest that that's not relevant.  I do -- I do think that that is part of -- when you're doing the balancing, you know, and when you're -- when you're discussing -- you know, you're weighing this First Amendment interest against the -- you know, against the -- the interest in this company, Bayside, that this company has in its copyrights, you know, I think that if -- if the speaker is given a real chance to -- to appear and appear anonymously, I -- I think that -- and they don't, I think -- I think that has to be one factor that's taken into consideration.  But I only think it's one factor.  I mean, I think, you know, to the extent that you are suggesting that the failure of the anonymous speaker to appear in the litigation means automatically that you win, I don't agree with that at all.  I mean, I think that as Public Citizen, you know, explains, you know, the Court has

31

an independent authority to back -- independent obligation to balance these two interests, one of which is this very important First Amendment interest.

MR. HADLEY:  But I want to emphasize that this could have been done -- you know, Twitter could have hired a lawyer for Moneybags, and Moneybags could have come in and made the fair use -- provided the information needed to conduct a proper fair use --

THE COURT:  What makes you think Twitter could have -- could Twitter really have hired a lawyer for them? I mean, is -- maybe it could have.  Wouldn't that be a conflict of interest?

MR. HADLEY:  I don't know.  Twitter is here asserting fair use rights on behalf of one of its users. So, I don't see how it would be any different.  But this person, we don't know that -- who this person is or where they are or if they could afford a lawyer or not afford a lawyer or anything else.  But Twitter hasn't told us.  We have no way of knowing, and the bottom line is that -- that these fair use factors, again, I come back to the fact that there is only one tweet that could even arguably connect the photo with -- with the subject of the commentary.  None of the others come even close, and without some sort of at least obvious relationship, we need that speaker to tell us why.  Twitter can't tell us why.  Twitter just guesses.  We

32

have no evidence in the record whatsoever from which a proper fair use analysis can be done.  And in that situation, whenever you're looking at the factor of the -- of the purpose and character of the use, the nature of the copyrighted work, the evidentiary burden on the -- on the substantiality of the portion copied.  We don't know why this speaker used six photos.  We don't know why they picked those particular photos and not other photos.  We don't know why they didn't use just parts of the photos instead of the entire.

Without the speaker coming in --

THE COURT:  Do we know that they used the entire photos?

MR. HADLEY:  I'm sorry?

THE COURT:  Do we know that they used the entire photos?

MR. HADLEY:  Yes, they used the entire -- they used six complete photos.  They didn't just crop it.  They didn't do anything else.  They used six complete photos that belong to Bayside.  And without the speaker coming in anonymously, which, by the way, happens in a lot of cases, particularly in cases where the lawsuits are filed first outside of -- just subpoena cases outside of the DMCA area, the speakers come in sometimes anonymously, and they can defend this action or they can defend and provide the

33

information that is needed to conduct a fair use analysis. But when we are given the burden, in order to unmask or to determine who the speaker is so we can exercise our copyright rights and take some action, we're essentially in handcuffs without the speaker coming in and explaining why these factors support a fair use defense when the speaker hasn't done it, when Twitter hasn't gone to the speaker and found out the information and at least provided an affidavit saying --

THE COURT:  Well, I -- I --

MR. HADLEY:  -- we don't --

THE COURT:  I agree with you that it is a disadvantage to -- to you and to Twitter and to the Court to not have the speaker participating in the discussion about fair use, but to say that we're in handcuffs, I'm not sure I would agree with that.  I mean, there -- you know, we can -- we can conduct some sort of analysis on -- on fair use I think.

Let me -- let me give -- I know that Twitter -- Twitter's lawyers have been sitting there silently for quite a while.  Do you want to kind of jump in and respond to anything that's been said so far?

MR. SCHOTTLAENDER:  Thank you, your Honor.  And, no, I don't have a significant amount to add.  It sounds like the Court is aligned with Public Citizen and with

Twitter on substantive areas of the law or substantive areas of the law that Twitter cares most about, which is the protection of anonymous online speech and Twitter's ability to raise those arguments on behalf of its users. And, so, I don't have a ton to add.

Very briefly, I want to remark on only two points. First is this question of the user not appearing, and I think the way that you phrased it, your Honor, was -- was exactly right. Twitter agrees that the user's participation would be helpful in fair use analysis. I don't think there's any denying that. But it's absolutely not essential, and several courts around the country, multiple appellate courts have held that fair use can be analyzed just on the -- the speech or the content alone. And, so, going forward, even if the Court were to find that there was not fair use for these particular tweets, I do think it's an important holding going forward to establish that tweets alone could establish fair use in -- in other cases.

The second is this idea of a user not appearing and -- and how that affects the balancing test. I don't -- the point I want to make here is that that factor should not singularly benefit Bayside. And, as Public Citizen pointed out, the user appears --

THE COURT: Sorry. What -- I want to make sure I understand what you're saying. You said what factors should

not singularly benefit Bayside?

MR. SCHOTTLAENDER:  Yes, your Honor.  There's a lot of discussion about the user having not appeared in this case or not defending themselves in this case.  And -- and a lot of that discussion centered on essentially whether that should impact -- like benefit Bayside.  But I think Public Citizen's point on this is very compelling.  This user has not touched their Twitter account or appeared in this litigation since a court ordered notice went out.  And that alone should singularly show the sort of chilling concerns that Twitter has here that -- that dragging users into litigation like this to defend their speech will impact further speech, anonymous speech on Twitter's platform. And, so, I would just ask that the Court not singularly think that -- that the user not appear in here or walking away from their Twitter account actually benefits Bayside. It's a -- a very gray area, and I think Twitter's position would be that that actually shows the balancing test weighs against Bayside in this case.

The very last point -- sorry, your Honor -- is just that I want to make clear this Lenz case and how it -- it ties in with the prima facie elements.  The Ninth Circuit in Lenz held very clearly that fair use is not a defense as everybody's referred to earlier in -- in this hearing. Instead, fair use is a non-infringing use.  It is an

inherent part of Bayside establishing that it has a prima facie case consistent with Dendrite or Highfields analysis. And, so, your Honor, I just want to make --

THE COURT:  Does it matter?  I mean, I'm not -- I'm not really sure that it matters because what the -- the point I'm trying to make is that a -- whether it's a defense -- whether you call it an affirmative defense or, you know -- I was just reading -- I think it was Copyright in a Nutshell, you know.  It describes fair use as an affirmative defense, but -- but my -- my point is I don't think it matters in this context because you've got the -- you know, this -- the whole thing, you know, the whole inquiry has this First Amendment overlay to it, this -- this need to -- potential need to protect anonymous speech.  Maybe not, right.  But the -- the potential is there.  And in light of that, you know, court -- you know, and each case is very different, and the Court has to do a bunch of balancing. And, as part of that -- and a bunch of analysis of a bunch of different things, and part of that analysis should be whether, you know, the -- you know, the -- the potential lawsuit, which hasn't even been filed is, you know -- you know, likely foreclosed by a fair use defense or whatever you want to call it.

MR. SCHOTTLAENDER:  Yes, your Honor.  No disagreement at all.  That's -- that's exactly right.

37

THE COURT:  Okay.  Anything else from Twitter before it looks like Mr. Levy does want to say something. Do you have any -- do you have anything else?

MR. SCHOTTLAENDER:  No, your Honor.

THE COURT:  Okay.  Mr. Levy?

MR. LEVY:  You know, it's hard to speak when you said such nice things about our brief.

THE COURT:  No.  You can -- please, disagree with me.  Tell me I've got something wrong.  I hate it when people --

MR. LEVY:  To the -- so there are two main reasons why Does don't appear.  Sometimes the notice isn't defective.  I -- I was in a situation in which I was representing a newspaper defending -- this is the Brody case in Maryland.  And, you know, while the case was pending in the court of -- Maryland Court of Appeals, we suddenly heard from the Doe that hadn't heard about the case even though it had been discussed.  There was a Trial Court opinion, and we were up in the Court of Appeals, which in Maryland is the highest court.  And I was flabbergasted, you know, just hadn't got notice.

Now, if Twitter's -- if the inference that Twitter asks you to draw that the notice from Judge Ryu has effectively had a chilling effect, that would actually tend to suggest that Doe did get notice.  But the other main reason why

38

Doe --

THE COURT:    But we don't know.

MR. LEVY:   We don't know.   We actually have no idea.   The other main reason why Does don't appear is, you know, expensive to appear in Federal Court.   This is a particular problem in the Northen District of California because all the platforms -- most of the major platforms are in the Northern District, and the cases often actually are pending elsewhere, but the platforms won't accept subpoena jurisdiction any place except in California.

And, so, Does, you know, this Doe, I mean, this speculation about whether the Doe is in New Zealand aside, I mean, this Doe could be in Washington State or could be in Alaska or whatever.   And if you don't know any lawyers in San Francisco, it's hard to come in.   And this has been a long-standing thing of mine.   These issues come up in the ND Cal all the time.

THE COURT:   There is a third possibility, right? The third possibility is that the -- this -- the person got the notice and they simply would prefer not to participate.

MR. LEVY:   That's right.   That's also a possibility, but one of the problems -- so, you -- the Court has a p ro bono panel, and I think there are probably many lawyers in the ND Cal that would be willing to accept pro bono appointments to do these cases.

THE COURT:  Oh, yeah, a case like this, absolutely.

MR. LEVY:  And if a court gets to the situation where it feels it needs the Doe's participation in order to make a fair adjudication of this case -- and I think Twitter has argued that you don't need the Doe's participation, and my -- I -- I really don't take a position on that for Public Citizen.  One thing the Court could do is refer the case to the Pro Bono Panel, and the Pro Bono Panel really ought to form a cadre of lawyers who are willing to take cases like this.  Obviously, EFF and the ACLU Northern California often do, we often do, although it obviously costs a lot for us to appear in the ND Cal because we're not -- I'm not eligible to join the Bar of this Court.  And, so, every time I appear, there's a pro bono fee.  But my guess is there are lots of lawyers out here that would do this work.

And, so, I would urge the Court, whether for this case or otherwise, to sort of talk -- for the judges to talk among themselves about whether there's a way to meet this problem.  I mean, I've sometimes reached out to some of my friends who practice out there and said "You should raise this with the Court."  But I raised this with your Honor because your Honor is obviously sensitive to this problem.

THE COURT:  Could I ask you another -- this sort of makes me think of another question that I wanted to ask

40

you, and it doesn't really -- it doesn't relate so much to this case as to how, you know, you talk about how so many of these subpoenas are in this District, right.

I think the way courts usually handle subpoenas, rightly or wrongly, right, is you know, you get a -- you get a request for a subpoena to Twitter, and you look at it, and you say, well, I don't really know if this is appropriate, but Twitter's a big boy, and so I'm going to sign off on the subpoena request -- I'm actually not sure if -- does a judge even need -- for one of these DMCA subpoenas, does a judge even need to sign off on it?

MR. LEVY:  It's the clerk, isn't it?

THE COURT:  Maybe it's just the clerk.

MR. HADLEY:  Clerk.

THE COURT:  Yeah.  So, okay, so, even -- even more to my point, right.  The -- the -- you know, the clerk issues the subpoena.  It automatically goes out.  Sometimes there's a motion to quash.  Sometimes there's not a motion to quash.  Presumably, a lot of times -- presumably there's a concern that there's not a -- the service provider may not file a motion to quash, and someone's -- someone's identity gets revealed maybe in circumstances where it shouldn't. And then -- but any -- in any event, it's not until somebody files a motion to quash that we really make the -- the party requesting the subpoena sort of go through the -- the -- you

41

know, go through -- you know, surpass the hurdles and justify, you know, the subpoena.

I mean, is there an argument that, you know -- and I don't know whether this would be consistent with the DMCA, but is there an argument that in the -- in a case where it's, you know, seeking, you know, the identity of somebody who's posting anonymously that the -- you know, the party seeking the subpoena has to make a showing up front with like a detailed declaration, you know, sort of applying the Dendrite test and explaining why they should get the subpoena.

MR. LEVY:  In the context of a plaintiff versus doe complaint, we have on occasion argued that at the motion for early discovery stage, the burden is on the plaintiff to make an appropriate showing and to -- to disclose the authority that requires a showing that to fail to give that kind of disclosure in an ex parte context raises ethical issues.  And no judge has wanted to sort of put it into ethical terms, for understandable reasons.  But we think that for a plaintiff in one of those cases, it is appropriate to require the plaintiff to make a showing.

So, I have a three-part answer, and that's part of it. I think under the text of the DMCA, I don't know how you would do that given that it's a mandatory duty on the part of the clerk to issue it.

42

THE COURT:  Okay.

MR. LEVY:  I would say that platforms like Twitter have been extremely responsible, and I want to praise -- I come to praise Twitter.  Yelp and Glass Door are platforms that consistently tell subpoenaing parties we want you to make a <u>Dendrite</u> type showing, and they spend good money to do so.  And, you know, some of them -- you know, they're rich companies obviously, but the fact that they spend their money on a firm like Perkins Coie to do this work really is praiseworthy.  But just sort of depend -- and, of course, they give notice to the Doe's, and that's really key.  Early on in this process, we and the ACLU and EFF got together on a set of -- set of standards for ISP's, which we call them I think platform are pretty good about providing notice, and sometimes they actually -- the notice actually says, oh, and, you know, Public Citizen, ACLU, and the EFF are available.  You might consult them.  I know that Yelp does that because we do get these things out of the blue in some cases.

But I think that's the best response I could give to your question.

THE COURT:  How common is it for any -- in a copyright infringement context, how common is it for a company to merely get a subpoena from the clerk's office as opposed to filing a lawsuit first?  As I was saying earlier,

43

a lot of times we get lawsuits against doe defendants.

MR. LEVY:  I mean, there is one particular entity. It's not a company.  It's actually the Jehovah's Witnesses, which has a -- an egregious track record of obtaining DMCA subpoenas.  Jehovah's Witnesses tend to be poor people.  It is a religious organization that appeals particularly to low information citizens and people abroad for that matter, and they almost always get the identity.  And then they "talk" to the user, and these are users who face shunning if they're identified, and it's a really terrible situation. And that actually -- they don't do that here.  They do that in the SDNY, and they do that in the White Plains Division of the SDNY because that's where they're located.

Beyond that, you know, I don't know how many companies routinely -- or entities routinely use the DMCA as -- as opposed to Doe complaints.  I mean, obviously, there are lots of situations in which it's completely appropriate to use the DMCA because there's genuine infringement going on. And, you know, we don't stand for that.  I mean, we -- Public Citizen has copyrights, and we enforce them,. and we don't stand for infringing.

THE COURT:  So, it seems to me -- I guess this is maybe a question for Mr. Hadley.  It seems to me that there are, you know, kind of two things -- two things that could happen in this case.  One -- one thing that could happen is

44

that I could rule on the motion to quash now based on the information -- pretty limited information that I've been given so far and, you know, decide, you know -- and I think, you know, sort of applying the approach that we've been articulating here today, that would mean that I would grant the motion to quash because I would -- you know, based on the information I have and based on sort of a glaring absence of information from -- from you, particularly about this Bayside and, you know, what's going on here with Bayside, partly also about the fair use, I -- I think I would have to, you know, grant the motion to quash.

Another option is the one that -- that Public Citizen suggests, right, which is get more information.  And Public Citizen says, "We don't know who's right here because you haven't gotten enough information."  And -- and you -- you know, you could -- you could try to get more information from the anonymous speaker, and Mr. Levy has suggested maybe issuing another notice and making clear in that notice that we would likely be able to appoint pro bono counsel for the anonymous speaker if they wished to appear as a Doe in this -- in this lawsuit, in this action to -- to sort of defend their position and then get a heck of a lot more information from you and whoever are the people who are paying your check about Bayside. and sort of who's behind Bayside and whether there are any -- is any connection at all between

45

Bayside or the people who run Bayside and this person, Sheth, and we could have -- we could even have an evidentiary hearing. We could have, you know, witness testimony on this. We could have a period of discovery on this if -- if Twitter is willing and if the -- if the pro bono counsel is willing, if somebody -- if somebody shows up as pro bono counsel. There could be discovery. There could be deposition testimony. There could be, you know, much more fulsome exploration of just who Bayside is and what they're up to.

So, I guess, Mr. Hadley, let me ask you, what do you want -- do you want to have the opportunity to undergo further proceedings to try to justify your subpoena request or do you want me to just deny it now, because those are really the two choices, and I think you absolutely -- I mean, I -- you know, it appears that Bayside holds the copyright to these images, and you absolutely have the right to pursue this, but I don't believe that you've -- I don't believe that you've made -- you know, when I'm conducting the balancing that needs to be conducted in a situation like this, I don't believe that you've justified the subpoena. You've not given me enough information to justify the subpoena. And, so, I'm happy to give you an opportunity to -- to conduct further factual development and justify, you know, Bayside's effort to -- to uncover the identity of this

46

person and, you know, issue a ruling after we do some more factual development.  Or do you want me to rule on the -- on the existing record?

MR. LEVY:  Well, this particular alleged infringer has already been given an opportunity to come to court and has --

THE COURT:  And I -- I want you to answer my question directly.  Okay.  Do you want me to rule on the record that I've been given on the motion to quash, the -- on the information, the limited information that I've been given?  Do you want me to rule on it now or do you want the opportunity to conduct further factual development and perhaps an evidentiary hearing to do a better job of justifying your subpoena request?  Which one?  Which is the -- which option do you -- do you want?  Do you want to think about it and let me know?

MR. HADLEY:  I don't think I have to think about it.  I don't think that -- that spending more money on this for further evidence is going to be a help.  So --

THE COURT:  Really?  Why not?  You've spent so much money on it already.  I mean, it wouldn't be that hard, I would think, to -- to provide, you know, some more detailed evidence on who Bayside is and what it's up to.  You really don't want to -- I mean, you've already spent so much.  Or whoever is paying your bills has already spent so

47

much.

MR. HADLEY:  We already have an extensive affidavit in the record on who Bayside is and what Bayside does.  The alleged infringer has been given an opportunity to come to court and --

THE COURT:  Vague.  It's pretty vague, and it doesn't really explain the timing of everything that Bayside did.  I mean, those are the questions that I would ask, some of the questions that I would ask Bayside's people, whoever they are.

MR. HADLEY:  I think that this person kept tweeting.  We didn't -- we didn't take down the speech, and in terms of fair use, I just don't think that fair use and balancing, to the extent that it's required is -- and we don't think that it is required.

THE COURT:  Okay.  Let me make clear that you have the opportunity to make a stronger showing to get your subpoena.  You're saying you do not want to take the opportunity to make a stronger showing and address some of the questions that I've raised here at this hearing?  You do -- you decline that opportunity?

MR. HADLEY:  Correct.

THE COURT:  Okay.  But why?  I just don't understand why, except maybe because you don't want an investigation into the identity of the Bayside people and

48

whether they have any connection with Sheth.

MR. HADLEY:  That's the -- and, as far as -- I can say that -- that the subject of the tweets has no ownership interest in Bayside.  This is all set forth in an affidavit.

THE COURT:  I know.  That is a very --

MR. HADLEY:  I'm not sure what else --

THE COURT:  -- carefully worded and slippery statement that you just made.  Do you -- let me ask does the subject of the tweets -- Mr. Sheth, does he know anybody who is connected into Bayside?

MR. HADLEY:  I don't know.  I don't know who the person is, and I don't know who they know.

THE COURT:  Okay.  Who -- can you name a person who is connected to this company called Bayside?  Can you name -- can you give me some names of people who operate or work for Bayside?

MR. HADLEY:  My client contact is a person named Mr. Kaufman.

THE COURT:  Mr. Kaufman?

MR. HADLEY:  That's all I know.

THE COURT:  What's his first name?

MR. HADLEY:  Burt I believe.

THE COURT:  Burt Kaufman.  And that's your client contact.  What's his -- what's his title?  What's his position at Bayside?

49

MR. HADLEY:  I believe he's the head of Bayside.

THE COURT:  Okay.  Does Bayside have a -- does -- and that's your client contact?

MR. HADLEY:  Correct.  That's who I send my bills to.

THE COURT:  Uh-huh.  And are there any other employees at Bayside?

MR. HADLEY:  I don't know.

THE COURT:  Okay.  And do you have any idea why Bayside was formed in October of 2020, around the time of these tweets?

MR. HADLEY:  My understanding is to hold photographs and to license them and to advise copyright owners and people that might be interested in selling their copyrights.

THE COURT:  And when did Bayside acquire the copyright in these -- in these photos?

MR. HADLEY:  Before they were used in the tweets. I'm not sure how long before.

THE COURT:  Okay.  Well, so -- so, Bayside registered the copyright in the photos on like November 2nd, right, something like that?

MR. HADLEY:  The registration -- what I do know is that the registration happened after the initial tweets were posted.

THE COURT:  And taken down, right?

MR. HADLEY:  And taken down -- well, I'm not sure about taken down.  What I do know is --

THE COURT:  Take down -- let's go through the timeline.  I'm interested in the timeline.  So, in -- so -- so, in October of 2020, Moneybags starts posting these tweets, right?

MR. HADLEY:  That's my understanding.

THE COURT:  In October of 2020, Bayside Advisory is formed, right?

MR. HADLEY:  I believe that was the -- there may have been a foreign registration earlier, but that's when it was formed as a Delaware company.

THE COURT:  But you're saying they may have started filing documents before then?

MR. HADLEY:  In a foreign jurisdiction, they might have.

THE COURT:  But you don't know?

MR. HADLEY:  I'm not sure.

THE COURT:  Okay.  The -- the -- Bayside issued a takedown notice to Twitter in -- on October 29th of 2020, right?

MR. HADLEY:  Correct.

THE COURT:  And then the images came down promptly, yes?

51

MR. HADLEY:  Yes, and the speaker kept tweeting well past that time, and there was never any --

THE COURT:  About Sheth?

MR. HADLEY:  -- never any request to -- yes.

THE COURT:  Sorry.  About Sheth?

MR. HADLEY:  About Sheth and other people, yes, other people in the -- as I understand it, other people in the financial industry.  There was never any request to take down any speech whatsoever.  And, in fact --

THE COURT:  I understand.  Okay.  And, so, then on November 2nd or 3rd or something like that, Bayside registers a copyright in the six photos --

MR. HADLEY:  Yes.

THE COURT:  -- that were used by Moneybags, right?

MR. HADLEY:  Yes.

THE COURT:  And then that's when it requested a subpoena from the clerk's office?

MR. HADLEY:  Correct.

THE COURT:  And then when did Bayside acquire the -- when did Bay -- it sounds like Bayside was not the creator of these images but it acquired the copyright in these images?

MR. HADLEY:  It acquired the copyright in these images from one or more photographers that Bayside I -- I think was familiar with.  I can't -- I'm not exactly sure

52

how Bayside --

THE COURT:  Do you know when?

MR. HADLEY:  -- the photographer.

THE COURT:  Do you know when?

MR. HADLEY:  I don't know the exact date.

THE COURT:  Do you know an approximate date?

MR. HADLEY:  Actually, I -- I don't know if it was before Bayside originally registered in Delaware or not.

THE COURT:  Okay.  I mean, it would be weird for Bayside to acquire the copyrights -- acquire the rights in the photos before Bayside was Bayside, right?

MR. HADLEY:  Not necessarily.  I mean, Bayside could -- I mean, somebody affiliated with Bayside could have acquired the rights and then formed Bayside as a company. That happens frequently.  I --

THE COURT:  Say that one more time.  Sorry.

MR. HADLEY:  People acquire rights in photographs and then later incorporate -- the only reason to really incorporate -- if I go and acquire a right in a photograph, I don't have to incorporate it.  In fact, I could -- I could own a lot of photographs.  If I want to license them, sometimes it's to an advantage to incorporate as an LLC. And, so, my --

THE COURT:  And, so, it might be -- it might be that somebody was -- had the rights to these photos and they

53

-- and they -- had the rights to the photos for a long time and then they formed Bayside and they -- and then they -- and then they transferred the rights to Bayside and Bayside registered them?

MR. HADLEY: And started to -- well, not these particular photographs, but -- but along with other photograph, Bayside started to exploit them in terms of licensing.

THE COURT: And but -- but you don't know? You don't know whether --

MR. HADLEY: I don't know. I can't --

THE COURT: Even though this is your client and the litigation is all about these photographs?

MR. HADLEY: Well, the litigation is about these photographs, but under the DMCA, the standards under the DMCA (sic) and, respectfully, I -- you know, I understand the Court has its view regarding the circumstances, but -- but, frankly, there's nothing in the DMCA other -- actually, nothing in the DMCA that would make what Bayside is and when it acquired the photographs relevant except for the purposes of eventually bringing a lawsuit, which is the purpose of seeking the Section 512(h) subpoena. And, actually, 512(h) has built-in protections even for anonymous speakers. Once -- once you find out who this is, even assuming -- there's no guarantee that if Twitter responds to the subpoena, that

54

we -- that Bayside would be able to even find out who this speaker is.  But, even if it could, under 512(h), Bayside can't share that with anybody.  Bayside can only use that for purposes of bringing a -- a lawsuit against this --

THE COURT:  Which is why one of the most important questions, which hasn't been answered yet, is does Bayside have any connection with Sheth and do the people at Bayside have any connection with Sheth.  And that is a question that has gone unanswered in this -- in this record.  And, you've -- and the strong suspicion is that Sheth does have a connection to these people because of how carefully you worded your -- your statements about Sheth not having any controlling ownership interest in Bayside or Sheth not, you know, having -- owning the copyrights or whatever -- whatever it is.  I don't remember exactly what you said, but I remember it was very studiously carefully worded, which raises more suspicion about whether -- whether there's any connection between Bayside and Sheth.

Mr. Levy?

MR. LEVY:  I also note I'm a member of the New York Bar as well as the D.C. Bar, and in New York, lawyers have somewhat different standards about what they say in affidavits.  But, as I read it, this was an affidavit by counsel from -- outside counsel from Bayside, and when I looked at it, I wondered how outside counsel had personal

knowledge of the statements that were made.  How would outside counsel know whether Brian Sheth ever had interest in these photographs?

THE COURT:  It's not even a declaration that I should be considering actually.  I mean, it's not even -- I'm not even sure it's appropriate to consider a declaration from outside counsel along these lines.  I mean, it's it's just not -- it's not reliable.  I hadn't thought of that, but thank you for reminding me.

Let me -- let me ask Twitter and Mr. Levy what -- what they think I should do under the -- under the circumstances.  Maybe I'll start with Mr. Levy.

You know, Mr. Hadley has made very clear he wants me to rule on the current record.  He does not want further factual development.  He declines the opportunity to further develop the record in support of his effort to get a subpoena.

Does that -- does that mean I'm stuck?  Like, what if I said I really want further factual development before ruling on this issue because I'm not sort of in a position -- I haven't been given enough information to conduct the kind of balancing test that we've been talking about here.  What should I do in that situation?

MR. LEVY:  So, as a neutral, it's hard for me to say you should rule one way or the other, but I actually do

respect the right of a potential plaintiff to bring a case, to construct a particular record, perhaps for the purpose of making certain legal arguments and to take that to the Ninth Circuit if they strongly feel that they're right. And, you know, Public Citizen is a plaintiff-oriented firm, and -- and I respect Bayside's right to take this case to the Ninth Circuit based on the current record if that's what they think is the appropriate contact. I was my guess that some of their amici would love to do that, and they might even do it without charging Bayside because they think the principle's important. I don't know. But reading -- I mean, the amicus briefs on Bayside's side are very strong and take a position, and I respect their right to get to the Ninth Circuit based on the current record.

So, I don't want to say that you should impose on Bayside the obligation to provide further information if Bayside has made a determination that that's not what they want to do. I mean, you know, they decide how much resources they want to put into a particular case at a certain level of judicial system, and I think that deserves some level of respect from the Court.

Certainly, further exploration could be interesting.

THE COURT: What about -- I appreciate your comments. I mean, what if -- what if I'm concerned that there has been -- there's been -- may have been an abuse of

57

process in this case?  Under those circumstances, might I have, you know, sort of an independent obligation to, you know, develop the facts more?  I guess it wouldn't be developing the facts in connection with the motion to quash. If Bayside says, "No, we want you to decide the motion to quash on the current record," and if Twitter agrees, I decide that's what I do.  And then if I -- if I feel like I have an independent duty to explore whether the -- Bayside has abused the -- the judicial process and committed Rule 11 violations, then -- then I could do that on my own.

MR. LEVY:  Yeah, it could come up in two contexts. One is I suppose -- I mean, I haven't looked at this question in advance of this hearing.  Certainly, a court has the ability to sua sponte address potential Rule 11 issues without a motion, and I -- I have to assume there's been no safe harbor letter sent here.  There's been no reference to it.  I haven't heard about that.  And I haven't looked at the question about whether Twitter could make a Section 505 motion for attorney fees based on a 512(h) proceeding.  I actually -- this idea is occurring to me only in response to your Honor's question.

THE COURT:  Right.  Then there's also the --

MR. LEVY:  Whether it would want to invest its resources in that, you know, is a -- as opposed to just standing up for its user is a different question.

THE COURT:  Yeah.  There's also a -- there's also the Court's inherent authority, and you have the ability to, you know, sanction somebody pursuant to the Court's inherent authority, but, you know, requires extensive fact finding and investigation and, you know --

MR. LEVY:  And you would think you would want counsel assisting the Court to pursue those issues, and if there's nobody on the D side who wants to do that, that's taking a significant burden on the Court, and, you know, I certainly respect -- I mean, I've certainly been in situations where courts felt that the processes had been abused and took various steps to vindicate those processes. And, you know, I've done Rule 11 cases for lawyers too, and I hate to speak --

THE COURT:  Okay.  Appreciate it.  Twitter I assume -- I assume Twitter would say Mr. Hadley wants you to rule on the motion to quash on the current record, does not want to do any further factual development.  I assume you agree with that?

MR. SCHOTTLAENDER:  Yes, your Honor.  The motion to quash should be granted.

THE COURT:  Okay.  All right.  Well, I'll give it -- I'll give this all a little bit more thought and then issue a ruling.

MR. HADLEY:  Your Honor, if I could just add one

59

thing.  We believe strongly as a matter of law that Twitter has no standing, that no court has ever allowed a service provider to assert a --

THE COURT:  Well, you don't need to repeat what's in your -- you don't need to repeat what's in your briefs. I mean, if there's something important you need to say that wasn't in your briefs and that this discussion was brought out, go ahead.  But you don't need to just intone what you've already said in your briefs.

MR. HADLEY:  Understood.  My point is simply that we believe as a matter of law that fair use isn't appropriate or balancing isn't part of the test, and we're prepared to go to the Ninth Circuit on that.

THE COURT:  Great.

MR. HADLEY:  And that's why -- that's why I took the position that I took.

THE COURT:  Okay.  Terrific.  Thank you very much.

MR. LEVY:  Thank you, your Honor.

MR. HADLEY:  Thank you.

MR. SCHOTTLAENDER:  Thank you, your Honor.

MS. SCHWARTZ:  Thank you, your Honor.

(Proceedings adjourned at 3:58 p.m.)

60

CERTIFICATE OF TRANSCRIBER

     I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

     I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Monday, May 23, 2022