UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DMCA § 512(H) SUBPOENA TO TWITTER, INC. | Case No.  20-mc-80214-VC<br><br>**ORDER GRANTING MOTION TO QUASH; DENYING MOTION TO COMPEL**<br><br>Re: Dkt. Nos. 5, 10, 22 |

In a series of six tweets accompanied by photos, an anonymous Twitter user who goes by @CallMeMoneyBags criticized Brian Sheth, a private-equity billionaire. Within a few weeks of the postings, a mysterious entity called Bayside Advisory LLC registered copyrights in the photos, petitioned Twitter to take them down, and served a subpoena on Twitter for information identifying the person behind the @CallMeMoneyBags account. Twitter has moved to quash the subpoena, arguing that revealing the user's identity would violate his First Amendment rights. Because Bayside has not made out a prima facie case of copyright infringement, and for the independent reason that the user's constitutional interest in anonymity outweighs Bayside's expressed interest in his identity (at least on this record), the subpoena must be quashed.

## I

@CallMeMoneyBags (let's call him MoneyBags) is an anonymous Twitter user. Although his account currently boasts over sixteen thousand followers, at the time of the events leading to this dispute his following was considerably more modest, hovering between 350 and

400. Much of his publicly viewable content consists of criticism of wealthy people, particularly those who work in tech, finance, or politics (such as Jeff Bezos, Elon Musk, and Nancy Pelosi).

In late October 2020, MoneyBags turned his attention to Brian Sheth, a private equity billionaire. Over ten days, MoneyBags tweeted about Sheth six times, each time commenting on Sheth's wealth and alleged lifestyle. One tweet, for example, reads: "Brian Sheth has upgraded in his personal life. The only thing better than having a wife . . . is having a hot young girlfriend." The tweet was accompanied by hashtags including "#FilthyRich" and "#BabeAlert" and included a photograph of a woman in a bikini and high heels. The other tweets were similar, each containing a photo of a woman and many alluding to an extramarital affair between her and Sheth.[1]

On October 29, just days after this string of tweets, an entity called Bayside Advisory LLC contacted Twitter, asserting that it had copyright ownership in the six photos and demanding that they be taken down. Four days later, Bayside registered its copyrights. Twitter ultimately took down the challenged photos (but left the text of the tweets in place). Bayside then came to court and obtained a subpoena requiring Twitter to provide information identifying the person behind MoneyBags's façade. Twitter objected, arguing that doing so would violate MoneyBags's First Amendment rights. Eventually, Twitter filed a motion to quash the subpoena and Bayside responded with a motion to compel a response to it.

The case was originally assigned to Magistrate Judge Donna Ryu, who issued an order offering MoneyBags an opportunity to file evidence in support of Twitter's motion to quash. Judge Ryu ordered Twitter to serve a copy of her order and all relevant briefing on the email address associated with MoneyBags's Twitter account and gave MoneyBags permission to appear anonymously. MoneyBags did not respond. Judge Ryu then denied the motion to quash

---

[1] October 19: "The new Mrs. Brian Sheth at the top of Beverly Hills." October 20: "Life is good when you are Brian Sheth. #NoTax . . . #Babes #PrivateJet." October 21: "Brian Sheth is the best investor in private equity. This is how he spends his money. I would say this is a good investment!" October 22: "Good morning from Mrs. Brian Sheth #2. Life is good when you're a 44-year old private equity billionaire. . . . #Billionaire #Upgrade #Sexy." October 28: "Brian Sheth is the King of Private Equity. . . . #Babes #LadiesMan."

and granted the motion to compel, noting that the court "lack[ed] a well-developed record" on which to find that MoneyBags was innocent of copyright infringement or to balance the competing interests of the parties involved. Twitter challenges that ruling here.

## II

Normally, a motion to quash involves a subpoena for discovery connected to a pending lawsuit. But this case is different. Bayside requested a subpoena under the Digital Millennium Copyright Act, which permits copyright owners to obtain subpoenas for information identifying alleged copyright infringers independent of any pre-existing lawsuit. 17 U.S.C. § 512(h). In this context, "the subpoena is its own civil case, and the motion to quash is dispositive of the sole issue presented in the case—whether the subpoena should be enforced or not." *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 880 (N.D. Cal. 2020). Because this is a dispositive motion and the parties did not consent to magistrate judge jurisdiction, the Court considers the motion to quash de novo.[2]

## III

"[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the contents of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 342 (1995). This protection applies with equal force to online speech. "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation . . . [or]

---

[2] Bayside argues that Twitter's motion to quash must be denied because it was filed too late. Under the Federal Rules, a motion to quash must be "timely" filed. Fed. R. Civ. P. 45(d)(3)(A). "Courts generally agree that a motion to quash under Rule 45 is timely if made before the date specified for compliance with the subpoena." *Handloser v. HCL America, Inc.*, 2020 WL 4700989, at *4 (N.D. Cal. Aug. 13, 2020). But where (as here) a subpoena recipient moves to quash after lodging a written objection to the subpoena, the motion to quash is timely so long as it is filed within a reasonable time after the conclusion of informal efforts to resolve the objections. See *Friedman v. Old Republic Home Protection Co., Inc.*, 2014 WL 12845131, at *2 (C.D. Cal. June 24, 2014) ("It is not appropriate . . . to rob [a party] of the opportunity to move to quash the subpoena because its good faith efforts to resolve the matter outside of Court made its request untimely under some decisions interpreting Rule 45.").

concern about social ostracism.'" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (alterations in original) (quoting *McIntyre*, 514 U.S. at 341–42). When adjudicating discovery requests that would unmask an anonymous speaker, then, courts must consider the First Amendment implications of disclosure—just as they would when adjudicating any other discovery request that risks infringing First Amendment rights.

      *Perry v. Schwarzenegger* offers a roadmap for how this inquiry should play out. 591 F.3d 1147 (9th Cir. 2010); *see In re Anonymous Online Speakers*, 661 F.3d at 1174. In *Perry*, the Ninth Circuit reviewed a district court's decision requiring the proponents of a state ballot proposition to turn over internal communications relating to their campaign strategy. *Perry*, 591 F.3d at 1152. Upon recognizing the First Amendment interests at stake, the court balanced the plaintiffs' interest in the disclosures against the constitutional burden that disclosure would impose on the defendants. *Id.* at 1162–65. The court issued a writ of mandamus vacating the district court's discovery order after finding that "discovery would likely have a chilling effect on political association," while the plaintiffs "ha[d] not shown a sufficient need for the information." *Id.* at 1165.

      Operationally, the inquiry consists of two steps. First, the party seeking the disclosure must demonstrate a prima facie case on the merits of its underlying claim. Second, the court balances the need for the discovery against the First Amendment interest at stake. This resembles the analysis courts around the country have employed when adjudicating motions that would result in the unmasking of anonymous speakers. *See, e.g.*, *Dendrite International, Inc. v. Doe No. 3*, 775 A.2d 756, 760–61 (N.J. Super. Ct. App. Div. 2001); *Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969, 974–75 (N.D. Cal. 2005); *see also* Brief of Public Citizen as Amicus Curiae in Support of Neither Party, Dkt. No. 39-1, at 14–15. Thus, when adjudicating a subpoena or other request for compelled disclosure that would reveal the identity of an anonymous speaker, a court should (1) notify the speaker and provide them with an opportunity to (anonymously) defend their anonymity; (2) require the party seeking disclosure to make a prima facie showing on the merits of their claim; and (3) balance the equities, weighing the

potential harm to the party seeking disclosure against the speaker's interest in anonymity, in light of the strength of the underlying claim.

IV

Bayside argues that three aspects of this case distinguish it from other motions in which a party seeks to unmask an anonymous speaker, making the aforementioned test inapplicable: (1) Bayside's subpoena arises under the Digital Millennium Copyright Act (DMCA), which provides its own procedures through which copyright holders can subpoena internet service providers; (2) the underlying dispute is a copyright claim, and copyright law has some First Amendment protection "built in"; and (3) the speaker has not shown up, despite an invitation to do so anonymously. None of these distinctions support application of a different test.

A

The DMCA provides a streamlined procedure through which copyright holders may subpoena internet service providers (like Twitter) for information identifying an alleged copyright infringer. *See* 17 U.S.C. § 512(h). As discussed above, the DMCA allows copyright holders to request a subpoena directly, outside the confines of a lawsuit. The statute requires prompt compliance by the service provider: "Upon receipt of the issued subpoena . . . the service provider shall expeditiously disclose" the required information to the copyright owner, "notwithstanding any other provision of law." § 512(h)(5). Bayside argues that this restriction divests the court of authority to consider the merits of the copyright claim or issues of First Amendment privilege when faced with a motion to compel or quash a DMCA subpoena.

Bayside's reading of the DMCA raises serious constitutional concerns. After all, it is not enough to say that a speaker could assert their right to anonymity after their identity has been revealed; at that point, the damage will have been done. Fortunately, the statute does not compel (or permit) this result. Section 512(h) provides that "the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum." § 512(h)(6). This provision

incorporates Federal Rule 45, under which a court must "quash or modify" a subpoena that "requires disclosure of privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii). A recipient of a DMCA subpoena may therefore move to quash on the basis that the subpoena would require disclosure of material protected by the First Amendment. *See, e.g.*, *Signature Management Team, LLC v. Automattic, Inc.*, 941 F. Supp. 2d 1145, 1152–53 (N.D. Cal. 2013); *In re Verizon Internet Services, Inc.*, 257 F. Supp. 2d 244, 263–64 (D.D.C. 2003), *rev'd on other grounds*, *Recording Industry Association of America, Inc. v. Verizon Internet Services, Inc.*, 351 F.3d 1229 (D.C. Cir. 2003). The fact that the DMCA allows a potential copyright infringement victim to issue a subpoena to a service provider without first filing a lawsuit says nothing about whether courts should consider the interests of anonymous speakers in the same way they would in other situations.

## B

Bayside next argues that, to the extent MoneyBags has any First Amendment interest in this case, it is wholly accounted for through copyright's fair use analysis, which allows the public to use copyrighted works in certain circumstances without facing liability. As Bayside notes, while the First Amendment does not protect copyright infringement, "copyright law contains built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186, 219–20 (2003). This has led some courts to eschew interest balancing in cases seeking to deanonymize alleged copyright infringers. *See In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 882 (N.D. Cal. 2020) (noting that applying the two-step approach in the context of a copyright dispute would be "problematic" because "[t]he doctrine of fair use provides everything needed to balance the competing interests of the First Amendment and the copyright laws"). But while it may be true that the fair use analysis wholly encompasses free expression concerns in some cases, that is not true in all cases—and it is not true in a case like this. That is because it is possible for a speaker's interest in anonymity to extend beyond the alleged infringement.

Consider a hypothetical not far afield from these facts. An anonymous blogger writes hundreds of blog posts criticizing a powerful political figure, Mr. X. In one post, the blogger

includes a copyrighted image owned by Mr. X. If Mr. X were to sue for copyright infringement, the court would need to consider the interests on both sides—even if the blog post did not constitute fair use. The blogger's interest in anonymity (with respect to Mr. X) may be so great as to outweigh Mr. X's interest in enforcing his copyright.[3]

## C

Finally, Bayside argues that MoneyBags's absence dooms Twitter's motion. But although MoneyBags's presence would be helpful, it is not necessary. There are many reasons why an anonymous speaker may fail to participate in litigation over their right to remain anonymous. In some cases, it may be difficult (or impossible) to contact the speaker or confirm they received notice of the dispute. Even where a speaker is alerted to the case, hiring a lawyer to move to quash a subpoena or litigate a copyright claim can be very expensive. The speaker may opt to stop speaking, rather than assert their right to do so anonymously. Indeed, there is some evidence that this is what happened here: MoneyBags has not tweeted since Twitter was ordered to notify him of this dispute.

The Ninth Circuit has accordingly recognized that internet platforms can assert the First Amendment rights of their users, based on the close relationship between the platform and its users and the "genuine obstacles" users face in asserting their rights to anonymity. *In re Grand Jury Subpoena, No. 16-03-217*, 875 F.3d 1179, 1183 n.2 (9th Cir. 2017). As a platform that permits anonymous posting, Twitter risks losing users if people learn that the company discloses users' identities to anyone who asks. Moreover, Twitter's interest in this dispute aligns with that of MoneyBags; both have an interest in protecting MoneyBags's ability to speak his mind on Twitter without facing retaliation. Finally, there are genuine obstacles to MoneyBags's participation, given the expense of litigation and the lack of a contrasting economic incentive in this suit. *Cf. Powers v. Ohio*, 499 U.S. 400, 415 (1991) ("[T]here exist considerable practical

---

[3] This concern still exists where the copyright owner and the subject of the anonymous speech are different people, but it can sometimes be alleviated by a court order requiring that the speaker's identity remain anonymous on the docket and that the party serving the subpoena not disclose the identity to any third party.

barriers to suits by the excluded juror because of the small financial stake involved and the economic burdens of litigation."). To be sure, MoneyBags may be better equipped to articulate his interest in maintaining anonymity in this context, but his failure to appear does not prevent the Court from considering First Amendment interests when adjudicating the motion, as it would do in a more typical case.

## V

As explained above, to defeat Twitter's motion to quash, Bayside must first state a prima facie case of copyright infringement. If it can do so, the Court must weigh the potential harm to Bayside if the subpoena is not enforced against the potential harm to MoneyBags if his identity were revealed to Bayside.

## A

Copying does not violate the copyright laws if it constitutes fair use. Although fair use is colloquially called an "affirmative defense" to copyright liability, this is something of a misnomer because "[f]air use is not just excused by the law, it is wholly authorized by the law." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151–52 (9th Cir. 2016); *see* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of copyright."). To make a prima facie case of copyright infringement for the purposes of obtaining a subpoena, then, a party must make a prima facie case that the infringing use did not constitute fair use. In some cases, no analysis is required; it is obvious, for example, that downloading and distributing copyrighted music via peer-to-peer systems does not constitute fair use. *See Sony Music Entertainment Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565–66 (S.D.N.Y. 2004). But in other cases, a mere description of the copying raises serious questions of fair use. *See, e.g.*, *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 884 (N.D. Cal. 2020). This may require the copyright owner to offer evidence to make a prima facie case.

The copyright statute lays out four non-exclusive factors for evaluating whether a use constitutes non-infringing fair use. Courts are to consider:

> (1) the purpose and character of the use, including whether such use

is of a commercial nature or is for nonprofit educational
purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to
the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the
copyrighted work.

17 U.S.C. § 107. The fair use analysis is fact intensive; courts are to "eschew 'bright-line rules'
and 'categories of presumptively fair use,' and instead engage in a 'case-by-case analysis.'" *Dr.
Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020) (quoting *Campbell
v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577, 584 (1994)). All four factors are "to be explored,
and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at
578.

1. Begin with the "purpose and character of the use." 17 U.S.C. § 107(1). In addition to
considering the purpose of the use (whether, for example, it "is for criticism, or comment, or
news reporting"), this factor asks whether the new work "adds something new, with a further
purpose or different character, altering the first with new expression, meaning, or message."
*Campbell*, 510 U.S. at 578–79. Put another way, this factor asks "whether and to what extent the
new work is 'transformative.'" *Id.* (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103
Harv. L. Rev. 1105, 1111 (1990)).

The use here—tweets by an unverified Twitter account with a small following that only
garnered a handful of likes, retweets, or comments—is not commercial, a fact that "tips the
scales in favor of fair use." *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1204 (2021).
What's more, the use is transformative. Considered on their own, the copyrighted photos may
have aesthetic value. But MoneyBags was not using the photos for their artistry. Rather, by
placing the pictures in the context of comments about Sheth, MoneyBags gave the photos a new
meaning—an expression of the author's apparent distaste for the lifestyle and moral compass of
one-percenters. This transformation fits squarely within Section 107's examples of fair use,
particularly "criticism" and "comment." *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th
Cir. 2013) ("[A]n allegedly infringing work is typically viewed as transformative as long as new

expressive content or message is apparent," even where the work "makes few physical changes to the original or fails to comment on the original."); *Katz v. Google Inc.*, 802 F.3d 1178, 1182–83 (11th Cir. 2015).

2. The second fair use factor—the nature of the copyrighted work—"recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works." *Dr. Suess Enterprises*, 983 F.3d at 455 (quoting *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997)). As a result, "fair use is more difficult to establish when the former works are copied." *Id.* (quoting *Penguin Books*, 109 F.3d at 1402). In evaluating this factor, courts also consider whether the copied work was previously published. *Id.*

Bayside states that its photos were "first published in 2017 and 2020."[4] The fact that the photos were already published at the time of the copying weighs in favor of fair use. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003). Also weighing in favor of fair use is the fact that many of the photos appear to be candid shots in a public setting—the type of picture one would post to their Facebook or Instagram. *See Katz*, 802 F.3d at 1183.

On the other hand, a couple of the photos are somewhat more artistic. One photo, for example, depicts a woman standing in front of a mirror taking a selfie with her phone. The shot is taken by a third party, rather than the woman herself, and the lighting, positioning, and wardrobe appear to have been intentionally selected. Another photo is a self-portrait that, charitably construed, may have involved creative positioning of the subject's hair and deliberately applied makeup. That said, Bayside has made no attempt to provide evidence that the photographer "attempted to convey ideas, emotions, or in any way influence [the subject's]

---

[4] In what will emerge as a theme of this ruling, Bayside's assertion is not without doubt: Bayside notes the alleged publication dates in its opposition to Twitter's motion to quash, without any accompanying declaration. Normally the Court would decline to credit this unsupported assertion, but because it is not outcome determinative, its truth will be assumed for purposes of this motion (and this motion only). The Court interprets Bayside's phrasing (noting that the photographs were *first* published in 2017 and 2020) as implying that all the photos were published before they were tweeted by MoneyBags. This is the first (of many) issues where further evidentiary support from Bayside would have been helpful.

pose, expression, or clothing." *Id.* (Indeed, Bayside has not provided any information about the photographs, including who the photographer is, where the photos were taken, or the identity of the woman they feature.) At best, the second factor may tilt slightly in favor of Bayside due to the artistic elements of these latter photographs, although the factor is largely inconclusive.

3. The third factor considers the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor is not particularly helpful in the context of a photograph or drawing that "is not meaningfully divisible," as the entire work must be used to preserve any meaning at all. *Seltzer*, 725 F.3d at 1178; *see also Katz*, 802 F.3d at 1183–84. This factor is therefore neutral.

4. The fourth and final factor asks what effect the use has "upon the potential market for or value of the copyrighted work." § 107(4). Analysis of this factor requires courts to consider "not only the extent of the market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market" for the original and derivative works. *Dr. Seuss Enterprises*, 983 F.3d at 458 (internal quotations omitted) (quoting *Campbell*, 510 U.S. at 590).

When a use is transformative and non-commercial, it is difficult to infer market harm. In such a case, "it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it." *Campbell*, 510 U.S. at 591. To make a prima facie case of copyright infringement in this context, Bayside must offer some explanation for how its financial interests in the copyrights could be harmed by a use like the tweets at issue here.

Bayside offers that it is a "communications and strategic advisory firm" that "licenses photographs for commercial exploitation." But beyond this vague explanation of its business model, Bayside nowhere explains what the potential market for these licenses is, let alone how that market could be impacted by tweets like MoneyBags's. Further, Bayside's explanation of its business is hard to accept at face value given the suspicious circumstances surrounding this

motion (more on that later). And Bayside declined an opportunity (offered at the hearing) to supplement the record with actual evidence of market harm. This factor therefore weighs in favor of fair use.

* * *

Taking into account all of these factors, Bayside has not established a prima facie case of copyright infringement.

**B**

Even if Bayside had made a prima facie showing of copyright infringement, the subpoena would still need to be quashed because the balance of equities tilts in MoneyBags's favor.

Considering "the nature of the speech" at issue, there is no question that significant First Amendment interests are at stake. *In re Anonymous Online Speakers*, 661 F.3d 1168, 1177 (9th Cir. 2011). The six tweets flagged by Bayside are best interpreted as vaguely satirical commentary criticizing the opulent lifestyle of wealthy investors generally (and Brian Sheth, specifically). For example, one tweet reads: "Good morning from Mrs. Brian Sheth #2. Life is good when you're a 44-year old private equity billionaire." The tweet accuses Brian Sheth of having a mistress and links his infidelity to the broader class of "private equity billionaires," suggesting that wealth (or working in private equity) corrupts. Unmasking MoneyBags thus risks exposing him to "economic or official retaliation" by Sheth or his associates. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 341–42 (1995). And MoneyBags's interest in anonymity is heightened further by his other tweets, which discuss issues of political importance such as sexual harassment, tax enforcement, and corporate regulations.

This is where the mystery surrounding Bayside makes a difference. If the Court were assured that Bayside had no connection to Brian Sheth, a limited disclosure subject to a protective order could perhaps be appropriate. But the circumstances of this subpoena are suspicious. As far as the Court can tell, Bayside was not formed until the month that the tweets about Sheth were posted on Twitter. It appears that Bayside had never registered any copyrights until the registration of these six photographs, which happened after the tweets were posted. And

there appears to be no information publicly available about Bayside's principals, staff, physical location, formation, or purposes.

Rather than explaining these puzzling facts, Bayside's counsel simply filed a declaration stating that "Bayside is not and has not ever been owned or controlled by Brian Sheth." The declaration also notes that Brian Sheth does not own, and has not ever owned, "any interest in the copyrights to the Photographs."[5] Even setting aside the fact that this declaration came from counsel, rather than a party with personal knowledge of its veracity, it raises more questions than it answers. Is Bayside owned or controlled by someone associated with Brian Sheth? Was Bayside formed in response to these tweets? How did Bayside come to acquire these copyrights, and from whom? When pressed at the hearing, Bayside's counsel, Lawrence Hadley, would not (or could not) expand on these vague assertions.

> Mr. Hadley: I can say that—that the subject of the tweets has no ownership interest in Bayside. This is all set forth in an affidavit.
>
> . . .
>
> The Court: . . . [D]oes the subject of the tweets—Mr. Sheth, does he know anybody who is connected [to] Bayside?
>
> Mr. Hadley: I don't know. I don't know who the person is, and I don't know who they know.
>
> The Court: Okay. Who—can you name a person who is connected to this company called Bayside? Can you name—can you give me some names of people who operate or work for Bayside?
>
> Mr. Hadley: My client contact is a person named Mr. Kaufman.

Dkt. No. 52 at 48.

Of course, even a weighty First Amendment interest may give way in the face of a strong interest on the other side. But here too, the Court is left scratching its head. It is not clear what Bayside has to gain from pursuing a copyright action against MoneyBags. Injunctive relief is

---

[5] Bayside makes these same claims about Robert Smith and Bob Brockman—two associates of Brian Sheth who are also mentioned in some of MoneyBags's tweets.

unavailable, as Twitter has already taken the photos down. Because Bayside registered the copyrights after the alleged infringement, it appears as though Bayside could recover only limited damages that are unlikely to cover the considerable expense of pursuing its copyright claims and no attorney fees. *See* 17 U.S.C. § 412. And as discussed in the preceding section, Bayside has offered no information on the market harm it could conceivably have suffered as a result of the postings. All Bayside has offered in support of its identity are a few vague descriptions of its services—claiming it is a "communications and strategic advisory firm" that "licenses photographs for commercial exploitation." A visit to Bayside's website (which the Court conducted with Bayside's counsel present during the hearing) revealed a shell of a site with no information about Bayside, what it does, who owns the company, who works for the company, or how any customer could license the photographs the company allegedly owns. *See Bayside Advisory LLC*, https://baysideadvisory.com [https://perma.cc/26DU-3NNT] (captured May 16, 2022).

Given all the unknowns, at oral argument the Court offered Bayside an opportunity to supplement the record with an evidentiary hearing or additional documentation. Bayside declined, stating that it preferred the motion to be adjudicated on the current record. There would perhaps be some benefit in insisting on an evidentiary hearing to explore the circumstances behind this subpoena—to explore whether Bayside and its counsel are abusing the judicial process in an effort to discover MoneyBags's identity for reasons having nothing to do with copyright law. Perhaps that hearing could even result in an award of attorney's fees for Twitter. But Twitter stated that it too prefers not to have an evidentiary hearing. Accordingly, the record will stand, and the people connected to this mysterious company will succeed in preserving their own anonymity. But Bayside's choice not to supplement the record makes it quite easy to balance MoneyBags's interest in preserving his anonymity against Bayside's alleged interest in protecting its apparent copyrights. On this record, even if Bayside had made a prima facie showing of copyright infringement, the Court would quash the subpoena in a heartbeat.

* * *

14

Twitter's motion to quash is granted and Bayside's motion to compel is denied.

**IT IS SO ORDERED.**

Dated: June 21, 2022

_____

VINCE CHHABRIA
United States District Judge